EDWARD E. O'BRIEN, Appellant, from Decree of Judge of Probate.

Knox.　Opinion April 12, 1905.

*Wills.　Testamentary Capacity.　Undue Influence.　Burden of Proof.*

Mere advice, suggestions, reasons or arguments addressed to the judgment of a person who is contemplating making a will, and which are intelligently considered and adopted by such person, do not constitute undue influence, nor does importunity even and persuasion, if the testator has sufficient mental capacity and strength of will to properly weigh and consider them and to resist them, unless adopted by him in the free exercise of his judgment and volition. Upon the other hand, whatever may be the nature and extent of the influence, if, because of the physical or mental weakness of the testator, and the nature and persistency of the influence exerted, it is such that the testator is unable to resist it, if it deprives him of his power to act as a free agent in the manner that he otherwise would, it is sufficient to avoid the will, because a will made under such circumstances is not the will, and does not carry out the wishes of a capable testator, acting as a free agent.

It follows that the true test is to be found, not so much in the nature and extent of the influence exercised, as ·in the effect that such influence has upon the person who is making his will. Whatever the nature and extent of the influence exercised, if in fact it is sufficient to overcome the volition and free agency of the testator, so that he does that which is not in accordance with the dictates of his own judgment and wish, and what he would not have done except for the influence exerted, it is undue influence. But the mere fact that arguments and suggestions are adopted by a testator, and his will, on that account, is different from what it otherwise would have been, is not sufficient. It necessarily depends upon the further question as to whether such advice or suggestions are intelligently and freely adopted, because they have appealed to the judgment of the testator, so as to become in accordance with his own desires, or whether because of the persistency of the importunity, or for any other reason, the testator is unable to resist and finally yields, not because of the voluntary action of his own judgment, but because, on account of the strength of the influence, or the weakness of his own judgment and will he cannot resist longer.

According to the rules of evidence and of practice which prevail in this state, the burden of proof, in its technically proper sense, does not ordinarily shift from one party to the other in the trial of a cause so long as the parties remain at issue upon a proposition affirmed upon one side and denied upon the other.

The fact that a person who occupies a close confidential relation to a testator draws the will of such testator, or takes an active part in its preparation, and receives a considerable bequest thereunder, does not shift the burden of proof upon the issue of undue influence from the contestant to the proponent.

Such a situation is a most important one and should be entitled to much force and bearing upon the issue involved. It would undoubtedly be sufficient, as a matter of fact, to arouse suspicion and to require the closest scrutiny and most careful examination of all of the surrounding circumstances, but it still remains a condition or situation of facts, the force and weight of which are to be considered with all the other facts and circumstances of the case. Such a situation might, as a matter of fact, cast upon the proponent the burden of explanation, and the absence of satisfactory explanation would be an additional fact of more or less weight. But the burden of proof upon the whole evidence, taking into consideration the situation referred to and all other circumstances, is still upon the contestant, who is bound to sustain the proposition asserted by him by a preponderance of all the evidence.

Upon a careful consideration of the whole case, including the relations existing between the proponent and the testatrix, the physical and mental condition of the testatrix and all facts and circumstances which have any bearing upon the question at issue, quite fully stated in the opinion, *Held*, that the will and the provisions in favor of the proponent were not procured by any undue influence exercised by him upon the testatrix, and that the verdict was entirely justified by the evidence.

On motion by appellant.   Overruled.

Appeal from the decree of the Judge of Probate, Knox County, admitting to Probate the will of Mary E. Campbell.   In the appellate court a jury trial was had and the jury rendered a verdict in favor of the proponent of the will, and thereupon the contestant filed a general motion for a new trial.

The facts, so far as material, are stated in the opinion.

*C. E. & A. S. Littlefield, and R. I. Thompson,* for appellant.

*Heath & Andrews, and M. A. Johnson,* for appellee.

SITTING:   WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

WISWELL, C. J.   This is an appeal from a decree of the Probate Court of Knox County admitting to probate the will of Mary E. Campbell.   Upon the trial in the Supreme Court of Probate, three

issues were submitted to the jury; as to whether the testatrix knew the contents of the instrument purporting to be her will; whether she had testamentary capacity, and whether in making the will she was unduly influenced. The jury answered all of these questions in favor of the proponent of the will, and the case comes here upon the contestant's motion for a new trial. In the argument before the law court counsel for contestant abandons the other issues and relies wholly upon the allegation of undue influence. In fact, the testamentary capacity of Mrs. Campbell has been admitted in the stipulation signed by the counsel.

Before stating and discussing the facts it may be well to formulate a statement of what is and what is not undue influence which will vitiate a will, so far as this subject may be applicable to the facts of the case. False statements of material facts and deception may be eliminated from the discussion, since there is no evidence to show that any fraud of this nature was practiced upon the testatrix. Mere advice, suggestions, reasons or arguments addressed to the judgment of a person who is contemplating making a will, and which are intelligently considered and adopted by such person, do not constitute undue influence, nor does importunity even and persuasion, if the testator has sufficient mental capacity and strength of will to properly weigh and consider them and to resist them unless adopted by him in the free exercise of his judgment and volition. Upon the other hand, whatever may be the nature and extent of the influence, if, because of the physical or mental weakness of the testator, and the nature and persistency of the influence exerted, it is such that the testator is unable to resist it, if it deprives him of his power to act as a free agent in the manner that he otherwise would, it is sufficient to avoid the will, because a will made under such circumstances is not the will, and does not carry out the wishes, of a capable testator, acting as a free agent. It follows that the true test is to be found, not so much in the nature and extent of the influence exercised, as in the effect that such influence has upon the person who is making his will.

Whatever the nature and extent of the influence exercised, if in fact it is sufficient to overcome the volition and free agency of the

testator, so that he does that which is not in accordance with the dictates of his own judgment and wish, and what he would not have done except for the influence exerted, it is undue influence. But the mere fact that arguments and suggestions are adopted by a testator, and his will, on that account, is different from what it otherwise would have been, is not sufficient. It necessarily depends upon the further question as to whether such advice or suggestions are intelligently and freely adopted, because they have appealed to the judgment of the testator, so as to become in accordance with his own desires, or whether, because of the persistency of the importunity, or for any other reason, the testator is unable to resist and finally yields, not because of the voluntary action of his own judgment, but because, on account of the strength of the influence, or the weakness of his own judgment and will, he cannot resist longer. It is undoubtedly true as has been argued, that in some cases it may be very difficult to determine whether a suggestion has been thus freely adopted, or has been merely followed by the testator because it has overcome his free agency, but it is none the less the true and decisive question and must be determined as well as possible in each case from all the facts and circumstances of the case. The citation of authorities in support of these statements of the rule is unnecessary, because such authorities are so exceedingly numerous.

We come now to the consideration of the facts of this case, many of which are unquestioned and the most of which are uncontradicted. The person who is claimed to have exercised an undue influence over Mrs. Campbell was one William G. Starrett who was named as executor in the will and who was largely benefitted by some of its provisions. It becomes necessary in the first instance to state fully, but as briefly as the case will admit, Mr. Starrett's connection with the making of the will, his previous relations with Mrs. Campbell, as well as those that existed at the time, and what influence he did in fact exert over her as to any of the provisions of the will in question.

The will was executed on the thirty-first day of October, 1900. The husband of Mrs. Campbell had died on the first day of that month. At that time Starrett was living in Massachusetts, in the vicinity of Boston. Mrs. Campbell and Starrett were second cousins, her

mother and his father were cousins. About the middle of September prior to Mr. Campbell's death on the first day of October, Mrs. Campbell wrote to Starrett, telling him of the serious condition of her husband's health and requesting him to come to Thomaston, if possible, as there might be business of importance about which she desired to see him. In response to this letter and to a telegram of similar effect, he arrived in Thomaston on September fourteenth and stayed until the twenty-fourth, during which time he had various interviews with both Mr. and Mrs. Campbell, but did not talk with Mr. Campbell about business affairs. Mrs. Campbell told him during this visit that in case of her husband's death she should want him to manage and settle his property and business affairs. After having left Thomaston for his home on the twenty-fourth, he received a telegram on the first day of October announcing Mr. Campbell's death, and at once returned to Thomaston.

Going back to the previous acquaintance between Starrett and Mr. and Mrs. Campbell, and their relations with each other, we find that Starrett when he was twenty-one years of age went into the employment of Mr. Campbell as a clerk in the latter's store and remained there for a period of two years. In 1879, he went into the employment of Mrs. Campbell's father Edward O'Brien, who was then conducting a business in Boston under the firm name of R. G. Morse & Co. He remained in that employment until 1888, and after an absence of four years went back in 1892. Edward O'Brien had previously died and Mrs. Campbell and her brother Edward E. O'Brien, were carrying on the business. From 1892, Starrett had charge of the Boston business until 1899, when it was closed out and the property sold. During that time Edward E. O'Brien as a member of the firm of Burgess O'Brien & Co., failed and made an assignment and the Boston business was thereafter carried on by Starrett under a power of attorney from Mrs. Campbell, Edward E. O'Brien and the latter's assignee. It does not appear that Starrett had any business relations with Mr. or Mrs. Campbell, prior to the death of Mr. Campbell, except to have charge of the Boston business in which she was interested, and except that he had a sum of money in his hands belonging to her for investment. But the Campbells

were on quite friendly terms with both Mr. Starrett and his wife, they occasionally corresponded, and the Campbells would occasionally visit the Starretts when they were in Boston.

After the funeral of Mr. Campbell, Starrett stayed in Thomaston during the month of October, devoting considerable of his time to the business affairs and property matters of Mr. Campbell. On the tenth of October, Mrs. Campbell first mentioned to Starrett the subject of the disposition of her own property. In relation to this conversation his testimony is as follows: · "She said that she wished to make some disposition of her property; that she did not wish any of it to go to Edward E. O'Brien, and while she hadn't decided just what disposition to make of it, she wanted me to advise her under the circumstances, and I advised her to make a will." Starrett further says in this connection that he has an impression that it would be legally necessary to mention her brother's name in the will, and so told her, and that she desired him to ascertain if this was true by consulting a lawyer. This he did and upon the twenty-fourth of October, or before that, informed her that he had ascertained that this would not be necessary. Between the twenty-fourth of October and the day of the execution of the will there were numerous interviews and conversations between them as to various bequests. Mrs. Campbell desired that great secrecy should be maintained as to the provisions of the will, and did not even want the scrivener, who drew portions of the will, and who advised in regard to its form, to know its contents. Upon this account, Starrett would frequently go to the office of L. F. Starrett, a counselor at law with an office at Rockland, obtain from him drafts of different clauses of the will, take them to Mrs. Campbell and submit them to her for approval or modification. While this work of preparation was going on in this manner, and after Mrs. Campbell had given Starrett the names of numerous beneficiaries, she said to him upon one occasion, and, as he says, without the slightest suggestion from him upon the subject," Will, I am going to give you $15,000." The various bequests determined upon by Mrs. Campbell during these interviews, the nature of which will be later considered, including that of $15,000 to Starrett, aggregated $119,000. Then according to Starrett's testimony after she had

completed the lists of names and amounts, Mrs. Campbell said, "that is all, what shall I do with the rest?" We quote this reply as testified to by him: "I asked her if she did not wish to leave anything to anybody else, and she said 'no what shall I do with it'. I asked her again if she didn't wish to make a bequest to somebody, or to give something in addition to what she had already given, and she said 'no, what shall I do with it'? I said, 'if you think I will make a good use of it give it to me', and she said, 'I will'." Accordingly the residuary clause in favor of Starrett was subsequently incorporated in the will.

It appears that Starrett had made inquiries, some of them of the contestant, as to the values of different properties belonging to Mrs. Campbell, and at that time estimated her whole estate to be of the value of $137,000. He says that the estate turned out to be worth $125,858.87. During these conversations he says that he suggested to Mrs. Campbell the names of two of her relatives, asking if she did not want to include them among her beneficiaries, but that she decided not to do so. After these various bequests had been fully determined upon and the drafts of different clauses had been submitted to Mrs. Campbell and adopted by her, either with or without modification, L. F. Starrett drafted the will leaving blanks for the names and amounts which were inserted by the proponent in accordance with the testatrix's directions, and on the 31st of October Mrs. Campbell and Mr. Starrett went to L. F. Starrett's office in Rockland where the will was executed. The relationship between the proponent and L. F. Starrett, if any, is not stated in the case.

It next becomes important to consider the physical and mental condition of Mrs. Campbell at the time of the execution of her will, her relations with her only heir-at-law, the contestant of the will, and any other matters that may throw any light upon the question as to the effect that Starrett's advice, suggestions or other influence, if any, may have had upon her. We do not find any statement in the case as to the age of Mrs. Campbell. It is said in one of the briefs that she was between sixty-six and sixty-seven years of age at the time of her death. She died of apoplexy on the twenty-ninth of December 1903, three years and two months after the execution of her will,

without any previous sickness.   So far as the case shows she was in good condition of health at the time of the execution of the will. As we have already seen, her husband died on the first day of the same month in which her will was executed.   They never had had children.   Mrs. Campbell was the daughter of Edward O'Brien, from whom a portion of her fortune was inherited, the balance coming from her husband.  At the time of the execution of the will, and at her death, Edward E. O'Brien, her only brother, was her only heir-at-law.   The relations between Mrs. Campbell and her brother were, at least, not cordial.   They were on speaking terms when they met upon the street or elsewhere, but very rarely exchanged calls, if at all, although he lived in the same village and nearly opposite to her place of residence on the same street.   During the sickness of Mrs. Campbell's husband, her brother did not come to the house, and he did not attend the husband's funeral although he was her only relative nearer than a cousin, niece or nephew.   Edward E. O'Brien had been the administrator of his father's estate, and the difficulty between him and Mr. and Mrs. Campbell, the relations between the brother and Mr. Campbell being even more strained, arose largely from the belief, whether unfounded or not is of no consequence, upon the part of the Campbells, that Mrs. Campbell as an heir of her father had not been treated with entire fairness by the administrator. Mrs. Campbell had petitioned the probate court to re-open the estate of her father, and at the September term of this court 1898 for Knox county had entered an appeal from the decree of the probate court in relation to this matter.   At the following term, Mr. Edward E. O'Brien entered in the same court six equity suits against Mr. and Mrs. Campbell which, so far as the case shows, were pending at the time of the execution of this will.   For some reason, at any rate, as plainly indicated by the will itself, which we will refer to later, and by various declarations, Mrs. Campbell was firm in her decision that she should make a distribution of her property in some way, and not allow it to descend to her brother as it would if he survived her in case she died intestate.

The record contains much evidence in regard to the mental condition of Mrs. Campbell.   At the trial her testamentary capacity was

in issue, and although that issue has now been abandoned her mental capacity and strength of mind and will are still of especial importance in considering the question whether she was or was not unduly influenced by Starrett. For many years Mrs. Campbell had had the unfortunate habit of drinking intoxicating liquors to excess. She was frequently intoxicated and frequently seen in that condition by her friends, neighbors, and others. It is not unnatural that when in that condition her manner and conversation were such as to give those who saw her the impression that she was more or less incoherent in her conversation and that her mind and memory were failing. But we are satisfied from all of the evidence in the case, especially from her voluminous correspondence, which was introduced upon this question, that when sober, and her habit of drinking was periodical rather than constant, she was a woman of, at least, the average mental ability and vigor. She read much both of newspaper and of current literature, and was especially well informed upon the topics of the day. She traveled considerably, using her means, large and ample for her, for the purpose of giving herself and the friends whom she took with her enjoyment in this manner. Dr. Walker, her attending physician for many years, says: "She was an intelligent woman, and a woman of average mental capacity." We are satisfied that this was a conservative statement in regard to the mental condition of Mrs. Campbell, and that in addition to this that she possessed, at least, the average strength of will. That she was not at all under the influence of liquor at the time of the execution and preparation of the will, is satisfactorily proved.

We will next consider the will itself, since in any case the will may or may not contain inherent evidence of undue influence or the absence of it. This will contains this clause at the beginning: "I have not fully decided as to the final disposition which I wish to make of my property. I do not wish it to go as the law would dispose of it in case I should die without making a will. Therefore, I make this will with the purpose of making another when I shall have more fully considered the matter, and if I should fail to make another before I die, this is the disposition which I make of my

property." The will then contains eighteen bequests to different relatives of Mrs. or Mr. Campbell in amounts of three, five and ten thousand dollars each; a bequest of $10,000 in trust for a niece of Mr. Campbell's; a bequest of $5000 to a woman who had worked for her, and whose husband had long been in the employ of Mr. and Mrs. Campbell; of $5000 to the Congregational Church at Thomaston, of which society she was a member; of $5000 to the town of Thomaston, in trust, the income to be devoted to the care of the cemetery lot in which her father, mother and husband were, and she was to be, buried, with the right to use any excess of the income, over what was required for that purpose, for the general improvement and care of the cemetery; and a bequest of $10,000 to the town of Thomaston to be held in trust for the benefit of the poor of that town. The will also contained the bequest to the proponent of $15,000 and the residuary clause in his favor.

We think, that the foregoing is a sufficient statement of all of the material facts. Do they show that, in accordance with the principles laid down in the beginning of this opinion, such influence was exerted by William G. Starrett for his own benefit, and that it had such an effect upon the free agency of the testatrix, that this instrument should not be admitted to probate as her last will and testament. In support of his contention, the contestant relies upon the great secrecy that was observed by Mrs. Campbell and Mr. Starrett, upon the confidential relations which existed between them and the great confidence that she reposed in his suggestions and judgment, upon the fact that the proponent was largely benefitted by certain provisions of the will, and participated to such an extent in its preparation, upon the fact that he advised making a will in the first instance, and upon other considerations. Let us consider to some extent the facts and testimony already mentioned with reference to these claims of the contestant. The will itself, omitting from consideration for the present the clauses in favor of the proponent, certainly contains no inherent evidence to the effect that the testatrix was influenced in any way or by any person in making it. It has a strong tendency, we think, to show exactly the contrary. The first clause, which we have quoted in full, shows that she was considering

her own wishes and making up her own judgment. in regard to the disposition of her property. She had not fully determined just what that disposition should be in all respects. But although this uncertainty existed, she had no doubt of one thing, that she proposed to make a different disposition than the law would make if she should die intestate. For this reason she appreciated the importance of making a will at that time, even if she should later find it desirable to modify it in some respects, so that in case she should die before making a change it would carry out her purpose so far as she had at that time decided. We can hardly imagine that a person, who was designing to procure a will for his own sinister purposes, containing provisions beneficial to himself, would allow such a clause to be inserted at the commencement if he had sufficient influence to prevent it.

The testatrix remembered numerous relatives, although not all, of her own and of her husband's, from whom a portion of her property came. She made as we have seen, eighteen different bequests to such relatives. Some of these recipients of her bounty were entirely unknown to the proponent, and none of them were at all upon intimate terms with him. She provided liberally for the care of the cemetery lot in which those nearest to her had been buried, and where she would be. She made a most generous provision for the poor of the town in which she had lived so many years, and provided that the management of this fund should be the same as that of the fund created by her father for the same purpose. She remembered her church, making a substantial provision for its assistance in the future. In all of these respects there is absolutely nothing to show, that in making these testamentary provisions, she was not following absolutely the dictates of her own judgment and carrying out her own wishes. The contrary conclusion is certainly to be drawn therefrom.

As to the nature and extent of the influence exercised by the proponent, if we consider the only direct testimony in the case, there was nothing said or done by him which could be said to amount to influence of any kind. And this direct testimony is supported rather than contradicted by a careful consideration and analysis of all of

the circumstances.   True, he advised her to make a will, but it was after she had said to him that she must make some disposition of her property because she did not want it to go to her heir-at-law, and after she had asked for his advice.   The advice given was not only entirely proper but it was the only advice that could properly be given under the circumstances.   The necessity for her to make some disposition of her property had evidently become impressed upon her mind by the recent death of her husband.

So far as the $15,000 bequest to the proponent was concerned, he says, that this was entirely the suggestion of the testatrix without the slightest suggestion being made by him.   As to the residuary clause, we have quoted the proponent's testimony as to all the conversation upon this subject.   What was said by the proponent amounted merely to a suggestion, it was not influence of any kind, proper or improper.   If his testimony is true, it could not have been sufficient to overcome the free agency of a person of average strength of intellect and of will.   There was no persuasion attempted or persistent importunity of any kind, merely a suggestion, which, we are satisfied, could not have been sufficient to have had any undue influence upon the testatrix.

In considering this question, we should not lose sight of one of the most important considerations in the case, the bodily and mental condition of Mrs. Campbell at the time to which we have already alluded.   She was not enfeebled in mind or body; the will was not made during the period of sickness; she was intelligent and well informed; she had sufficient mental ability to intelligently form her own judgment upon suggestions made, and sufficient strength of will to resist those that did not appeal to her judgment.

But it is argued that Mrs. Campbell had so much confidence in the proponent and placed so much reliance upon his judgment that any suggestion of whatever nature made by him was unhesitatingly adopted by her.   It is true, that as to the management of her business affairs from this time until her death, the proponent testified that she accepted his advice and suggestion without question, the counsel for contestant argues that it necessarily follows that any suggestion made by him relative to the disposition of her property

would be as unhesitatingly adopted. We do not think that this follows. As to the investment, sale, reinvestment and care of her property, she, not unnaturally, followed the advice and suggestion of the person to whom she had entrusted the same. These were matters about which she perhaps had little knowledge and took less interest, but she knew whom she desired to make the recipients of her bounty by testamentary devise, in regard to such matters she did not need his advice. Because a woman with a considerable amount of property should accept all suggestions as to the management of that property, made by the person to whom its management had been entrusted, it does not at all follow that she would adopt, without the exercise of her reason and judgment, his advice concerning matters about which she was capable of forming a judgment of her own, and about which she evidently had a mind of her own.

It is true, as argued, that great secrecy was observed by Mrs. Campbell and the proponent. No one had any knowledge in regard to the provisions of the will, and no one, except those who were obliged to, the scrivener and the witnesses, that she was making a will at all. It is undoubtedly true that where a will is made under such circumstances, and where a person who is largely benefitted by its provisions has much to do with its preparation, suspicion is naturally aroused, and all of the facts and circumstances surrounding the making of the will should be scrutinized with jealous care.

In this connection we may as well consider another proposition contended for by counsel for the contestant. It is this, that although the burden of proof, in the first instance, is upon a contestant who seeks to avoid a will upon the ground of undue influence, to use his own language, " where a party occupying a close confidential relation to the testatrix, himself draws the will or takes an active part in its production, and himself receives a considerable bequest thereunder, the law from these facts alone presumes, as a presumption of fact, the existence of undue influence, and the burden is upon such party seeking to prove the will, to rebut that presumption by the surrounding facts and circumstances." We are not sure that the counsel by this language means to claim that where this state of facts is shown to exist, the burden of proof upon the issue of undue

influence shifts from the contestant to the proponent. If he does we should not care to adopt it as an entirely accurate statement of the law, although it is undoubtedly in accordance with statements contained in many decisions which are to be found and which have been cited. According to our rules of evidence and of practice the burden of proof, in its technically proper sense, does not ordinarily shift from one party to the other so long as the parties remain at issue upon a proposition affirmed upon the one side and denied upon the other. The condition of things stated by the counsel in the statement of his proposition of law is undoubtedly a most important one, and would naturally and properly be entitled to much force and bearing upon the issue involved. It is undoubtedly sufficient, as a matter of fact, to arouse suspicion, and to require the closest scrutiny and most careful examination of all of the surrounding circumstances, but it still remains a condition or situation of facts, the force and weight of which is to be considered in connection with all of the other facts and circumstances surrounding the case. Evidence showing the condition of facts referred to may, or may not, be sufficient to sustain the burden of proof resting upon the contestant, according to the other circumstances of the case, and the determination of the tribunal which is passing upon the issue. Such a condition might, as a matter of fact, cast upon the proponent the burden of explanation, and the absence of satisfactory explanation would be an additional fact of more or less weight. But we do not regard it as accurately correct to say that upon the proof of this situation the burden of proof shifts from the one party to the other. This burden upon the whole evidence, taking into consideration the situation referred to and all of the other circumstances, is still upon the contestant, who is bound to sustain the proposition asserted by him by a preponderance of all the evidence. Nor do we regard it as entirely proper to say that the existence of this state of facts, as a matter of law raises a presumption of fact that undue influence has been exercised by the person occupying this close confidential relation. The issue is one of fact, to be determined by the tribunal to which it is submitted, and we do not approve of a statement to the effect

that any particular evidence is sufficient to change the issue from one of fact to one of law.

In determining this question, which so far we have considered independently of the verdict of the jury, we have given due weight to the situation that in fact existed. A close business relation did exist between the testatrix and the proponent. This relation had only commenced at the time that this will was being prepared. It continued from that time to the time of the testatrix's death. It is not entitled to precisely the same weight that it would have been if it had existed for some time prior to the making of the will, but still it should be very carefully considered, especially in connection with the further fact that the proponent was largely benefitted by some of the provisions of the will and had much to do with its preparation. In our opinion the proponent has satisfactorily sustained the duty of explaining the circumstances which have given rise to any suspicion as to the propriety of his conduct. His testimony was very full, and he was apparently especially frank in telling with great detail his entire connection with the preparation of the will. He has apparently attempted to conceal nothing, but with perfect freedom and frankness has admitted some things which might have some tendency against him upon this issue, and which could not have been otherwise proved.

We do not consider it at all unnatural that she should have made the bequests in his favor. She had already remembered all of the relatives, and had made all the bequests of a public nature, that she cared to. She naturally appreciated the kindness and the attention of the proponent, and his willingness to come to her and render assistance when she was in need of it, and when she was in great trouble on account of her husband's fatal sickness and death. It is a reasonable conclusion that she knew of no more satisfactory way to her to dispose of this sum of $15,000, and of the residuum that might be left after making all of these specific bequests, than to give it to him. For these reasons we are entirely satisfied with the verdict of the jury upon this issue. As we have already said, the situation, unexplained, was sufficient to arouse suspicion as to the propriety and good faith of the proponent, and for this reason we think

that no costs should be allowed against him.. The motion for a new trial is therefore overruled, and a decree will be signed affirming the decree of the Probate Court and remanding the case to the Probate Court for further proceedings in accordance with this opinion and the decree.

*Motion overruled.    Decree to be signed in accordance with the opinion.*