WILLIAM J. GRAHAM et al., Appellees, v. O. B. COURTRIGHT, Appellant.

**WILLS:** Undue Influence—Attorney Drawing· Will, as Beneficiary.
1  An attorney at law, in the drawing of a will, acts in a confidential relation to testator, he being specially called because he was such attorney, and because of testator's long friendship for him.

**WILLS:** Undue Influence—Evidence—Declarations of Testator.
2  Declarations of testator subsequent to the execution of a will may be admissible as showing his condition of mind, *but not as substantive evidence that undue influence had actually been exercised over testator in the execution of the will.*

**WILLS:** Undue Influence — Legatee-draughtsman — Presumption
3  and Burden of Proof.    A legatee-draughtsman, even though holding confidential relations with testator at the time of the drawing and execution of the will, does not have the burden of proof to show that he did not secure his legacy by the exercise of undue influence.    Legatee-draughtsmanship does not, *ipso facto,* create a presumption of law that the legacy was ob-

tained by undue influence. By drawing the will and by becoming a legatee therein, he supplies an item of evidence against himself—an inference that he may have secured his legacy by undue influence or fraud. The probative force of this inference, or suspicion, under varying circumstances, to establish undue influence, (a) may be negligible, (b) may constitute a prima-facie showing of undue influence, or (c) may be so overwhelming as to require the direction of a verdict against the legatee. *But so long as the inferences to be drawn from a given state of facts are in equipoise, the question of undue influence is for the jury.*

PRINCIPLE APPLIED:  See No. 4.

**EVIDENCE:** Presumptions — Fiduciary Relations — Legatee-Draughtsman. The doctrine that undue influence is to be presumed as between parties *inter vivos*, dealing with each other when fiduciary relations exist between them, *has no application to testamentary gifts.*

PRINCIPLE APPLIED:  Deceased, a careful, cautious business woman, was 74 years of age, had never been married, had one half brother, with whom she was living, and another brother, but whether full or half brother does not appear. Outside of blood relation, she was under no obligation to her relatives. She had been in good health until shortly prior to her death. She and defendant (an attorney) had known each other during all their mature years. Defendant, 25 years prior to the drawing of the will in question, had been attorney for her while she was acting as administratrix of her father's estate. Defendant and his family and deceased frequently exchanged friendly calls. During her last sickness, in accordance with a prior-expressed intention, she caused the defendant to be called to the house for the purpose of drawing her will. Apparently it was already understood that this half brother was to get the bulk of her property. The wife of this half brother and defendant were cousins, and defendant advised said brother not to be present during the preparation of the will, the reason being that the brother expected to be the principal legatee, and it would be better for him not to be present; and he was not present. Defendant was alone with deceased, she being bedridden. After some short time, defendant came out of the room, and informed the half brother that the deceased wished to make him a personal present. Defendant claimed that he told the half brother that he had, on account of this legacy to himself, re-

fused to draw the will, and that deceased had told him that, if he would not draw the will, she would not have any drawn. In this talk, nothing was said about the amount of the defendant's legacy. Defendant returned to the sick room and drew the will; witnesses were called; the will was fully executed, and defendant took it away with him. At the time of the witnessing, the will was not read over, but something was said by the deceased to the effect that she had given defendant a little present, and defendant remarked that he considered it more than a little. The will disposed of an estate of $25,000 by giving to the one brother $5,000, to the defendant $5,000, and the residue to the said half brother. Deceased died 12 days later. *Held*, there was no presumption that defendant had secured his legacy by undue influence; that, consequently, the burden of proof was not thrown on defendant to show that he did not obtain his legacy by such means, but, in view of defendant's being a stranger to the blood, and in view of the amount of the legacy, the record presented a jury question on the issue of undue influence.

*Appeal from Black Hawk District Court.*—FRANKLIN C. PLATT, Judge.

WEDNESDAY, MARCH 14, 1917.

REHEARING DENIED FRIDAY, JUNE 22, 1917.

ACTION to set aside the third paragraph of the will of Bessie Graham, as having been inserted through the alleged undue influence of the beneficiary therein, resulted in the verdict and judgment as prayed. The defendant appeals.—*Reversed.*

*J. W. Arbuckle*, for appellant.

*Mears & Lovejoy*, for appellees.

LADD, J.—Bessie Graham executed her will March 5th, and died March 17, 1913. She had never married, and was 74 years of age. She had been in good health until shortly before death, though she had become so fleshy that it was difficult for her to get about. The will was admitted to probate April 25, 1913, and this action to set aside the

third clause thereof was begun shortly afterwards. The will (1) directed the payment of debts, and (2) made a bequest of $5,000 to William J. Graham, to be paid in 15 months. The third clause read:

"To the long-time and faithful friend of my beloved father and my friend, the Hon. O. B. Courtright, I hereby in gratitude give and bequeath the sum of $5,000 to be paid to him by the executor hereof within 15 months from and after the probate hereof."

The residue of the estate, real and personal, was left to Theodore M. Graham, who was named as executor, without bond. The bequests were declared liens on the real estate. Theodore was a half brother, 10 or 12 years younger than decedent. Whether William was brother or half brother does not appear. Courtright drew the will, and the clause quoted is assailed only as having been inserted in consequence of undue influence exercised by him over testatrix. The jury, in so finding, accompanied their verdict with a statement denominating him "innocent of any charge of attempted fraud, but admit that he is the victim of a most unfortunate legal hypothesis which deprives him of an otherwise legitimate legacy."

Errors in ruling on the admissibility of evidence, in overruling motion to direct a verdict, and in instructions given, are assigned, and, as these are based on the evidence, the record may as well be stated at the outset. The acquaintance of Courtright and testatrix began when living with their parents on farms not far apart, in Grundy County. She continued there until about 1885. He began the practice of law in Parkersburg in 1878. Upon the death of her father, in 1888, she became administratrix of his estate, and employed Courtright as attorney to aid in its settlement. Thereafter, she lived at Cedar Falls until the death of her mother, when she returned for a short time to Parkersburg. Thereafter, she made her home for a time

with the family of William at Cedar Falls, and later lived at
the home of Gallagher in that place about 15 months. From
October, 1912, until her death, she lived at the residence of
Theodore Graham, at Waterloo. She had paid $1,500 to-
ward its purchase, by Theodore, in order to have a home
with him, and had paid him $300 besides, and, in addition
thereto, $20 per month for board. She owned a farm of 160
acres, worth $24,000, and had $600 in money at the time of
her death. Courtright had become a member of the firm
of Courtright & Arbuckle at Waterloo in 1894, and had
been in the active practice of his profession until 1911,
when he retired, but occasionally attended to legal business
thereafter. During all the years, they had met occasional-
ly, she had visited at his home up to the time of his first
wife's death, and after she came to Waterloo, he had called
on her frequently with his wife, as well as on Graham and
wife, the latter being his cousin. Their relations had
always been cordial. They were friends. At the trial,
Theodore testified that "she was a woman that had been
accustomed to carry on her own business matters all her
life, and was a very cautious, careful woman. She was in
the habit of reading over or having read over documents
before she signed them;" that, aside from being sick, he
"did not know whether her mind was as good as it ever
had been or not;" that she had said that, when she got
sick, she wished the defendant to draw her will.

Shortly before noon on the day in question, Mrs. Gra-
ham telephoned Courtright that "Bessie is sick, and would
like to see you." She had previously told him that testa-
trix would like to do something about her will. He called
after lunch. Theodore testified that Bessie was sick in
bed when he arrived; that he went to the sick room with
him.

"I told him that it had been my sister's request that,
whenever the time came when she wanted to dispose of her

property, I was to assist her. He said he thought it better for me not to, as I expected to be a beneficiary, so that, if the will was ever questioned, I could go on the stand and deny I knew what was in the will. As I went out, he put his hands on my shoulder and walked to the door with me and closed the door tight. He and she were left in the room; nobody else. After probably 10 or 15 minutes, he called me in, and says: 'Bessie wishes to make me a little present;' and I asked what was the nature of the present, —'as a retainer to act for the estate?' He says, 'No, just a little present.' There was no reply from her, and I replied, 'Why,' I says, 'It is hers, she can do as she pleases,' and I walked out. In a few minutes, he came out with his notes and wrote out the will, and after he got it wrote out, he told my wife to call in some witnesses, and they were called in. He went into the bedroom and I don't know what took place. The witnesses came. I did not read the will and was not in the bedroom while the witnesses were there. He came out with the will, stuck it in his pocket and walked out. When she came to make her home with me, she could not get out doors. She never went out of the room until the day she died. It was very difficult for her to walk about."

His wife, Effie Graham, corroborated her husband somewhat, by testifying:

"I heard him say, 'Theodore, you better be out, because if you were called on you can get up and say that you knew nothing that is in the will.' My husband came out and went into the kitchen. The door was shut up tight. Mr. Courtright was in the room alone with Bessie about 15 minutes, while he made the notes of the will. He then came out, and says, 'Theodore, Bessie wants to make me a little remembrance.' Mr. Graham says, 'What is this, in the nature of a retainer?' He says, 'No, just a little present.' I never heard the will read and did not read it."

On the same subject, the defendant testified as follows:

"I went to the home of Theodore Graham in response to this call. I met Theodore Graham and his wife and the decedent, Bessie Graham. I found the decedent in a bedroom on the first floor of the house. Theodore went into the room with me. I had some conversation with Theodore there in the room. I don't remember just how it started, but do remember of telling him that he had better not be present during the time that I was ascertaining what the provisions of the will were to be, and he replied that she had said when she came to make her will she wanted him present, and I said to him, 'Well, that is all right so far as she is concerned, but for your own interests I think it would be better for you not to be present. If any difficulty should arise hereafter, which is liable to, you would be in a better position if you could go onto the stand and testify that you knew absolutely nothing about what was in the will,' and upon that he went out of the room. Whether I put my hand on his shoulder or not, I don't remember. The bed lay lengthwise of the room. The door came in pretty near opposite the foot of the bed, and there was a stove and a chair between the door and the head of the bed, and I sat in the chair or stood there by the chair probably not over a foot or two from the bed, and not more than a foot or two from the door. After he went out of the door, I am quite sure I closed it."

The witness then explained the reason for the suggestion that Theodore be not present, relating a conversation concerning difficulty between testatrix and W. J. Graham, which conversation Theodore and his wife denied having had, and proceeded:

"That is substantially the conversation we had at that time, and I knew that fact when he came into the room, and thought that, if he was to be given the bulk of the property, it would be better for him—and I was interested in

him, his wife being a relative—that it would be better for him not to know the contents of the will, and said so to him, and said if there was any trouble it would be better for him to be able to go on the stand and swear that he didn't know anything about what was in the will. After being in the room some 5 or 10 minutes, I stepped to the door and called Theodore and told him to come. I think the door was closed, but I am not positive about that. He came into the room, and I said to him, 'We are up against it.' He says, 'What is the matter?' I says, 'Bessie wants to leave me a legacy or bequest, and I have refused to draw her will, and she says that she won't draw a will unless I draw it.' Theodore hesitated a moment, and then says, 'Well, I suppose what she gives you she gives by way of retainer to look after my interests, if there is any trouble.' I says, 'No, sir, what she proposes to do is to give me an out and out bequest.' There was nothing said about the amount of it in any shape. He says, 'Well, go ahead,' and turned around and went out, and I closed the door and did go ahead."

The subscribing witness, Thomas Dunlavey, testified that the will was not read over in his presence, and that, to the inquiry "if this was her last and only will," decedent responded "Yes;" and then she said that she left a little present or little remembrance to Mr. Courtright, and he said, in substance, that it was a "good remembrance." Mrs. Dunlavey, also a subscribing witness, testified that:

"Bessie said she left Mr. Courtright a little remembrance. I think he said, 'Well, Bessie, it is more than a little.' That is as near as I can tell the exact words."

This witness was asked, on cross-examination, whether decedent replied:

"Yes, it is what I wanted to do anyway. A. Well, she meant something like that, but I couldn't say just exactly what it was. Q. Well, was it substantially that?

A. Yes, it was something like that. She seemed to think that she wanted to give him something. Q. It was—she seemed to want to indicate that it was what she wanted to do, anyhow? A. Yes, sir. Q. Whether it was big or little? A. Yes, sir. Q. Was that your idea? A. Yes, sir."

1. WILLS: undue influence: attorney drawing will, as beneficiary.

I. Appellant contends that the trial court should have held that he acted merely as a scrivener, and erred in submitting the issue as to whether the relation of attorney and client existed between him and decedent when he prepared the will. There was no error of which he may complain. He was an attorney at law, and she knew him as such. Though wills are often drawn by others, their preparation is usually entrusted to attorneys, and, when an attorney is called for that purpose, the inference is that his services as such are desired. As said in *Loder v. Whelpley*, (N. Y.) 18 N. E. 874:

"A lawyer, in receiving the directions or instructions of one intending to make a will, is confided in by reason of his professional character as a counselor, and he acts in that capacity, although asking no questions, and without advising; he does nothing more than to reduce those directions to writing. The relation, therefore, between the testatrix and the witness was that of client and attorney."

This was said in holding that such attorney might not testify to communications between him and client under a statute of New York. Under the decisions of this and many other states, similar statutes do not apply in contests over the probate of the client's will. *Winters v. Winters*, 102 Iowa 53. The cases on which appellant relies so hold, and that, where an attorney acts as such, the statute has no application. *In re Downing's Will*, (Wis.) 95 N. W. 876; *In re Estate of Young*, 33 Utah 382 (17 L. R. A. [N. S.] 108), and cases collected in note; *Borum v. Fouts*, 15 Ind.

50. These decisions furnish no aid in the determination of whether an attorney acted as such in the preparation of a will, for in any event he may testify to what occurred, unless precluded from so doing on some ground other than professional confidence. Where an attorney is called upon to perform services in the line of professional employment, and he does so, the natural inference is that the relation of an attorney and client is thereby created. Such an inference was not obviated, but strongly confirmed, by the record before us; for appellant advised the residuary legatee with reference to his attitude as bearing on any possible contest thereafter, and also disclosed to him the testatrix's design of making him a beneficiary, thereby protecting decedent in the matter of her estate's reaching those she intended to benefit. This conclusion is not obviated by the circumstance that he had retired from the active practice of his profession, for he still attended to legal business entrusted to him, and his capability as a lawyer was unimpaired. The court might well have assumed that the relation of attorney and client existed, and therefore appellant was in no manner prejudiced by the submission to the jury of whether that relation existed.

II. Effie Graham testified that, after

2. WILLS: undue influence: evidence: declarations of testator.

the defendant had completed the will and had been gone about a half hour, she had a conversation with the testatrix, in which she inquired of her: "Bessie, what did you leave Orlando?" She said, "I left him $500." On cross-examination, she was asked:

"Who was present? A. Mr. Graham and I. * * * Q. Isn't it a fact that her first reply was that she did not wish to tell, or words to that effect? A. Well, no; she didn't say right out that she didn't wish to. She just spoke about the same as anybody, I guess. I says, 'Bessie, tell me,' and she did. She says, 'Mr. Courtright is a friend

of yours.' I says, 'Well, Bessie, tell me how much you left him.' She says, 'I left him $500.' I asked her a second time. I said to her, 'Bessie, tell me how much you left Orlando.' She said, 'Orlando is a friend of yours.' I said, 'Well, Bessie, tell me.' She says, 'I left him $500.' "

Her husband, Theodore, testified that he heard the conversation, and that:

"My wife asked her, 'How much did you leave Orlando?' That was the name that Mr. Courtright was always known by in the family. She said, 'I left him $500.' "

This evidence was received over objections, and it is contended: (1) That it was inadmissible for any purpose; and (2) that the instructions 6, 7 and 8, with reference thereto, were erroneous.

Evidence indicating the condition and attitude of decedent's mind was admissible as bearing on the issue as to whether decedent's mind had in fact been influenced. *Johnson v. Johnson,* 134 Iowa 33; *Cash v. Dennis,* 159 Iowa 18; *Hughes v. Silvers,* 169 Iowa 366; *Zinkula v. Zinkula,* 171 Iowa 287, 301.

The ruling of the trial court is approved on this ground. It is argued, however, that this class of evidence is not admissible until substantive testimony of the exertion of undue influence has been adduced. The satisfactory answer to this is that the order of the introduction of evidence is controlled by the discretion of the district court, and, in any event, the record was such that the exercise of undue influence might have been found by the jury. The decisions of this court cited above are conclusive that the above evidence is to be regarded as mere hearsay on the issue as to whether undue influence was actually exercised or exerted on the decedent, and may not be considered as bearing thereon. But the court, in the sixth instruction, enumerated many items of evidence, including "the evidence in

regard to the amount of the legacy to the defendant," and told the jury that:

"All this evidence may be considered by you not only in determining whether there was undue influence exercised by the defendant, but also in determining whether the defendant has overcome the presumption, if any, that he did exercise such undue influence over the said Bessie Graham."

This instruction manifestly was erroneous, and, in view of the fact that contestant relied largely on the inference of undue influence to be drawn from the fiduciary relation existing between testatrix and appellant, was extremely prejudicial.

3. WILLS: undue influence: legatee-draughtsman: presumption and burden of proof.

III. The trial court also instructed the jury, in substance, that, if the relation of attorney and client existed, the clause of the will was presumed to have been the result of undue influence exerted by him over testatrix, and:

"That the law then casts upon the defendant the burden of showing by a fair preponderance of the credible evidence that no undue influence was exercised by him over the said Bessie Graham that induced her to make the legacy to him."

4. EVIDENCE: presumptions: fiduciary relations: legatee-draughtsman.

Appellant contends that, even though he did act as attorney, the rule as to presumption and burden of proof was not correctly stated. The doctrine that undue influence is to be presumed as between parties *inter vivos,* dealing with each other when fiduciary relations exist between them, has no application to testamentary gifts. The theory as to contracts and gifts *inter vivos* is that a person having need of property, or at least a desire to retain it during life, is not likely to part with it without a measurably adequate equivalent. When it appears to have been

given away or parted with for an inadequate consideration
to one in a dominating position in relation to the donor
or grantor, the presumption arises that the latter has not
freely parted therewith and its enjoyment, but that his act
was induced by the undue exercise of the influence which
the beneficiary may have had over him; and this presump-
tion must be met by the grantee or donee and rebutted,
else, in equity, it becomes as a fact proven—a vitiating
factor in the transaction.    But the primary presumption
on which this whole doctrine rests is entirely lacking in
testamentary dispositions.    The natural inference that the
owner is adverse to parting with his property in the case
of gifts and contracts *inter vivos* is reversed in the disposi-
tion of property by will.    The design of the testator, as
manifested therein, is to give away a part of or all that he
has or may thereafter acquire.    He does not undertake to
part with its use or enjoyment, for the will speaks only
from the time of his death, and therefore its use and en-
joyment by him are not interrupted.    There cannot be an
assumption that testator would not part with his property,
for in the nature of things that is the object of his testa-
ment, and the property necessarily must pass to others up-
on his death.    Another reason for this distinction, recog-
nized by the authorities, is that the donee or grantee *inter
vivos* is a party to the transaction and possessed of knowl-
edge in relation thereto, and therefore is in a situation to
present the facts to court or jury, whereas a beneficiary is
not necessarily a party to the execution of the will, and
may have no knowledge thereof until years after it has
been made.    As said by Lord Penzance, in *Parfitt v. Lawless*,
L. R. 2 Pro. & D. 462:

"To cast upon him, on the bare proof of the legacy
and his relation to the testator, the burden of showing how
the thing came about, and under what influence or with
what motives the legacy was made, or what advice the

testator had, professional or otherwise, would be to cast a duty on him which in many, if not most cases, he could not possibly discharge."

For these reasons, a presumption of undue influence is not to be based on the mere existence of a fiduciary relation between the beneficiary under the will and the testator. *Tyson v. Tyson*, 37 Md. 567, 583; *Bancroft v. Otis*, 91 Ala. 279 (24 Am. St. 904). The relations which excite suspicion in transactions *inter vivos*—friendship, confidence and trust, affection, personal obligations—may, and usually do, justify and properly give direction to testamentary dispositions. All that can be said is that the existence of a confidential relation, such as that of guardian and ward, attorney and client, religious adviser and layman, and the like, affords peculiar opportunities for unduly exercising influence over the mind; and, where the dominant party in such relation initiates the preparation of the will, or gives directions as to its contents to the scrivener, or writes it himself,—in other words, is active either in its preparation or execution, and is made a beneficiary thereunder,—a suspicion arises that the benefaction may have resulted from the exertion of undue influence over the testator, rather than from his free volition. The strength of this suspicion necessarily depends on the circumstances of each particular case.

Under the civil law, a will in favor of the person writing it was void. The common law is less strict, and, where the legatee benefited does not sustain a fiduciary relation toward the testator, but prepares or participates in the preparation of the will, this alone will not warrant the denial of probate or an order setting aside its admission to probate. *In re Last Will of Hollingsworth*, 58 Iowa 526; *Denning v. Butcher*, 91 Iowa 425; *Reeves v. Howard*, 118 Iowa 121; *Hanrahan v. O'Toole*, 139 Iowa 229. That the draughtsman who prepared the will inserted a legacy in his

own favor is, at most, a suspicious circumstance, entitled to more or less weight, according to the facts of the case. It is said in some cases, in substance, to constitute a just ground of suspicion, and to exact vigilance on the part of the court; in others, that it excites stricter scrutinizing and requires stricter proof of volition and capacity; in still others, to call for satisfactory explanation.

Of course, the matter is not to be so stated to the jury, but their attention directed to the situation as it is, as to whether the legatee-draughtsman is related by blood, his previous association with testator, the amount of the legacy as compared with the entire estate, and the like. *Coffin v. Coffin,* 23 N. Y. 9 (80 Am. Dec. 235) ; *Stirling v. Stirling,* 64 Md. 138 (21 Atl. 273) ; *Yardley v. Cuthbertson,* 108 Pa. 395 (56 Am. R. 218) ; *Sellards v. Kirby,* 82 Kans. 291 (28 L. R. A. [N. S.] 270, 272).

Even where the legatee-draughtsman is shown to stand in a fiduciary relation toward the testator, the inference of undue influence is not always to be drawn therefrom. It was so held in *Trubey v. Richardson,* 224 Ill. 136 (79 N. E. 592), where articles of little value were bequeathed to the attorney who prepared the will, and it was said that this was not sufficient to raise a presumption of undue influence. In *In re Wells,* (Me.) 51 Atl. 868, the gift of a relatively small sum of $100 to the attorney drawing the will was said to be entitled to little weight. In *Bennett v. Bennett,* (N. J.) 26 Atl. 523, the court said:

"By the civil law a will written by a person in favor of himself was void, but this was never the rule of the common law. By the common law the mere presence of this fact was never sufficient of itself to invalidate the will. The utmost effect it was ever entitled to in any case was to create a suspicion against the validity of the will of more or less weight, according to the circumstances of each particular case; in some of no weight at all, as where the gift

to the draughtsman is small in amount or of trifling value; while in others, especially when coupled with other evidence of fraud or imposition, of very great weight, as, for example, where the will is drawn by the principal legatee, when the testator is very infirm, and his capacity is doubtful, and it is executed by the procurement of the principal legatee, when the testator is dying. 'But,' as was said by Baron Parke, speaking for the judicial committee of the privy council, in *Barry v. Butlin*, 6 Eng. Ecc. R. 417, 419, 1 Curt. Ecc. 637, 'in no case amounting to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the court in investigating the case, and calling upon it not to grant probate without full and entire satisfaction·that the instrument expresses the real intentions of the decedent.' The doctrine just stated is the established law of this state."

In *Snodgrass v. Smith*, 42 Colo. 60 (15 Ann. Cas. 548), the court, speaking through Campbell, J., after referring to cases affirming that a presumption of undue influence arises, said:

"The better considered cases do not go so far. The better rule is that this circumstance at most raises a suspicion, strong or weak, or, in some cases, of no force at all, depending on all the attending circumstances, which should, in a proper case, cause the court to require of proponent, in addition to proof of formal execution, other clear and satisfactory evidence, not necessarily that the will was read to or by the testator, but that he knew its contents, and was free from undue influence. Perhaps the rule has never been more clearly expressed than by the learned Baron Parke in the leading case of *Barry v. Butlin*, 1 Curt. Ecc. 637. In referring to a case like the one before us, and with respect to a contention similar to that made here, the learned judge said: 'If it is intended to be stated as a rule of law that in every case in which the party pre-

paring the will derives a benefit under it, the *onus probandi* is shifted, and that not only a certain measure, but a particular species of proof is, therefore, required from the party propounding the will, we feel bound to say that we conceive the doctrine to be incorrect. * * * And it cannot be that the simple fact of the party who prepared the will being himself a legatee, is in every case and under all circumstances to create a contrary presumption, and to call upon the court to pronounce against the will, unless additional evidence is produced to prove the knowledge of its contents by the deceased. * * * All that can be truly said is that, if a person, whether attorney or not, prepares a will with a legacy to himself, it is, at most, a suspicious circumstance of more or less weight, according to the facts of each particular case.' "

The rule is well stated in 1 Underhill on Wills, Section 137, in speaking of the situation where the draughtsman is a beneficiary and takes under the will:

"The safer and more correct statement of the rule is that such a condition of affairs creates no presumption, but merely raises a suspicion which ought to appeal to the vigilance of the court. Such wills are certainly not looked upon with favor. The court will cautiously and carefully examine into the circumstances which were attendant upon their execution, and will scan with a scrutinizing eye the evidence offered to procure their probate. No presumption of undue influence invariably arises from the fact that a will is drawn by a beneficiary under it, which is sufficient to cast the burden of showing the absence of influence upon the proponent. It is a fact to be considered with other facts. It is undoubtedly a suspicious fact, but its weight depends, not solely upon its character, but upon the facts and circumstances with which it is connected."

See, also, *Riddell v. Johnson's Exr.,* 26 Gratt. (Va.) 152; *Griffith v. Diffenderffer,* 50 Md. 466; *Appeal of O'Brien,*

(Me.) 60 Atl. 880; *In re Miller's Estate,* 31 Utah 415 (88 Pac. 338) ; *Post v. Mason,* 91 N. Y. 539 (43 Am. Rep. 689) ; *Dudley v. Gates,* 124 Mich. 440, 446 (86 N. W. 959) ; *Paine v. Hall,* 18 Ves. Jr. 475; *Downey v. Murphey,* 18 N. C. 82.

No one could well claim that an inconsiderable legacy, as compared with a large estate, to a legal adviser for many years, who prepared the will, is unnatural or indicative of the exertion of undue influence. Something more or different would seem necessary in order to raise such an inference. This much merely excites suspicion, and possibly enough to put the court on inquiry; but to justify an inference of the perpetration of fraud, something unlikely to have been brought about by fair means, or contrary to what was likely to happen in the ordinary course of events, must appear. In other words, some indicia of undue influence must be proven, as a substantial benefit, out of proportion as compared with the entire estate, weak mental or physical condition of testator, opportunity for imposition, whether bestowed on natural objects of affection and to those connected by the ties of blood, affection, or previous association, and other contingencies too numerous to mention. Undoubtedly, the circumstances may be such as that, unexplained, they would compel a verdict against the validity of the will or clause thereof assailed. This appears from numerous decisions bearing on the subject, collected in notes to *Kirby v. Sellards,* (Kans.) 28 L. R. A. (N. S.) 270, and *Snodgrass v. Smith,* (Colo.) 15 A. & E. Ann. Cas. 548. Such an inference is denominated in many cases a presumption of undue influence, and is treated as one of fact. This means, in the connection in which the expression is employed, no more than that a prima-facie case of undue influence of more or less strength has been made out, and must be met by other evidence in order to obviate a verdict so finding. What is to be inferred depends so much upon the facts of each particular case that we are inclined to

treat the showing as of mere items of evidence of varying weight, persuasive of or compelling certain inferences, rather than denominating the inferences necessarily to be drawn therefrom as presumptions. But the matter of nomenclature is not very important. Whether the neces-sary conclusion to be drawn from a particular state of facts be denominated a presumption of fact, or said to make out a prima-facie case. a verdict is inevitable unless the conclusion is met by evidence such as at least to put the issue in equipoise. Though appellant had acted as counsel for decedent at one time, it does not appear that he had been such during the 25 years preceding the making of the will. They had been friends for nearly a half century. She appears always to have transacted her own business, and was shown to have been in the possession of all her facul-ties, though physically weak. The fair inference to be drawn from the record is that she was under no obligation to the other beneficiaries named in her will, save through the ties of blood, and her promise to make contestant her residuary legatee. No secrecy was observed with reference to the proposed gift to appellant, and, had it been small as compared with her estate, we should have had no hesitancy in saying that the issue of undue influence should not have been left to the jury. But her fortune did not exceed in value $25,000, and the bequest to appellant was one fifth of this amount, and, as he was a stranger in blood and pre-pared the will, proof of these facts was sufficient to carry the case to the jury. The strength of the inference to be drawn from such a situation depends on the facts of each particular case. Thus, if the testator is weak of mind and in the care of the person supervising or preparing the will, the inference of undue influence is much stronger than where the faculties of the testator are unimpaired and the fiduciary relation merely that of present employment to prepare the instrument. The inference from the facts

shown by contestant may be such as to exact a verdict; but, if other evidence is adduced, such as may be found to put such inference in equipoise or overcome it, the issue is for the jury.

Whatever the proof, however, the burden does not shift, and it can never rightly be said that the burden is upon the proponent to negative the allegation of undue influence. Strictly speaking, the burden of proof never changes during the trial. *Barber v. Maden,* 126 Iowa 402; *Gibbs v. Farmers & Merch. St. Bank,* 123 Iowa 736. As said in the last mentioned case:

"When a prima-facie case is made out by presumption or otherwise, in order to destroy its effect and shift the burden of producing further evidence, the party denying it must produce evidence tending to negative the claim asserted to a point where, if no more testimony is given, his adversary cannot win by a preponderance of the evidence."

That a state of facts justifying or compelling a particular conclusion of fact, whether this be denominated a presumption or not, be proven, is only an incident of the trial, exacting evidence to meet it in order to avoid an adverse finding, and this sometimes occurs, though not often, several times in the course of a trial. But whether a fact be inferred from others proven or be presumed, it is not necessarily of any more probative force than were it established by direct evidence. Any of these standing alone may sustain a verdict. The burden of proof is not thereby changed, even though the situation be such that such conclusion or presumption or evidence must be met by other proof in order to avoid an adverse finding, and the jury may be so instructed, and further informed that the showing must be enough, at least, to put the evidence bearing on the issue in equipoise, but that, having done so, the burden of proof is on the party having the affirmative of the issue.

The Supreme Court of Maine, in *Appeal of O'Brien,* 60

Atl. 880, has dealt with the subject in accordance with the
views here expressed:

"According to our rules of evidence and of practice,
the burden of proof, in its technically proper sense, does
not ordinarily shift from one party to the other so long as
the parties remain at issue upon a proposition affirmed
upon the one side and denied upon the other. The condi-
tion of things stated by the counsel in the statement of his
proposition of law is undoubtedly a most important one,
and would naturally and properly be entitled to much force
and bearing upon the issue involved. It is undoubtedly
sufficient, as a matter of fact, to arouse suspicion, and to re-
quire the closest scrutiny and most careful examination
of all of the surrounding circumstances; but it still re-
mains a condition or situation of facts, the force and
weight of which is to be considered in connection with all of
the other facts and circumstances surrounding the case.
Evidence showing the condition of facts referred to may or
may not be sufficient to sustain the burden of proof resting
upon the contestant, according to the other circumstances
of the case, and the determination of the tribunal which is
passing upon the issue. Such a condition might, as a mat-
ter of fact, cast upon the proponent the burden of explana-
tion, and the absence of satisfactory explanation would be
an additional fact of more or less weight. But we do not
regard it as accurately correct to say that upon the proof
of this situation the burden of proof shifts from the one par-
ty to the other. This burden, upon the whole evidence, tak-
ing into consideration the situation referred to and all of the
other circumstances, is still upon the contestant, who is
bound to sustain the proposition asserted by him by a pre-
ponderance of all the evidence. Nor do we regard it as en-
tirely proper to say that the existence of this state of facts
as a matter of law raises a presumption of fact that undue
influence has been exercised by the person occupying this

close confidential relation. The issue is one of fact, to be determined by the tribunal to which it is submitted, and we do not approve of a statement to the effect that any particular evidence is sufficient to change the issue from one of fact to one of law."

See *Barry v. Butlin*, 2 Moore P. C. C. 480; *Weston v. Teufel*, 213 Ill. 291 (72 N. E. 908). Other decisions express the same view. Baron Parke, speaking for the Privy Council, in *Barry v. Butlin*, supra, after holding that the burden of proof does not shift in such a case, said:

"The strict meaning of the term *onus probandi* is this: that, if no evidence is given by the party on whom the burden is cast, the issue must be found against him. In all cases this onus is imposed on the party propounding a will; it is in general discharged by proof of capacity and the fact of execution, from which the knowledge of and assent to the contents of the instrument are assumed, and it cannot be that the simple fact of the party who prepared the will being himself a legatee, is in every case, and under all circumstances, to create a contrary presumption, and to call upon the court to pronounce against the will, unless additional evidence is produced to prove the knowledge of its contents by the deceased. A single instance, of not infrequent occurrence, will test the truth of this proposition. A man of acknowledged competence and habits of business, worth 100,000 pounds, leaves the bulk of his property to his family, and a legacy of 50 pounds to his confidential attorney who prepared the will; would this fact throw the burden of proof of actual cognizance by the testator of the contents of the will on the party propounding it, so that if such proof were not supplied the will would be pronounced against? The answer is obvious; it would not. All that can be truly said is that if a person, whether attorney or not, prepares a will with a legacy to himself, it is, at most, a suspicious circumstance of more or less weight, accord-

ing to the facts of each particular case; in some of no weight at all, as in the case suggested, varying according to circumstances; for instance, the quantum of the legacy, and the proportion it bears to the property disposed of, and numerous other contingencies; but in no case amounting to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the court in investigating the case."

It follows that the court erred in instructing the jury that the burden of proof was cast upon the appellant to establish by a preponderance of the evidence that testatrix was not dominated by Courtright in writing the will. All exacted, at the most, was that he meet the prima-facie case made against him by putting the evidence pro and con in equipoise. The burden of proof was on contestant at all times, and the jury should have been so advised. Though every case submitted to the jury is upon assumption that the evidence is such that a finding either way is warrantable, yet it is advisable, in a case of this kind, that facts from which a finding of undue influence may be inferred shall be pointed out in charging the jury; but, if this is done, attention should also be directed to those which tend to obviate such an inference and as definitely, such as long acquaintance, obligations, if any, to the beneficiary, and obligations, if any, to others; whether any secrecy was observed in inserting the clause or with reference thereto, conversations with the residuary legatee or others in the presence of testator when the will was being prepared; whether appellant then advised said legatee that he could not draw the will because of being made a beneficiary, and that testatrix had refused to have anyone else do so; whether said legatee directed him to go on and prepare it, and the like. What we have said disposes of the contention of appellant that a case was not made out for the jury.

For the errors pointed out, the judgment is—*Reversed*.

GAYNOR, C. J., WEAVER, EVANS, PRESTON and SALINGER, JJ., concur.