JANE T. GOODALE, IN EQUITY

*vs.*

VIOLA S. WILSON AND THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

York.  Opinion, September 4, 1936.

Lester M. Bragdon,
Spinney & Spinney, for plaintiff.
Arthur E. Sewall,
Oscar Neukom, for defendants.

Sitting: Dunn, C. J., Sturgis, Barnes, Thaxter, Hudson, Manser, JJ.

Hudson, J.   On the second day of September, 1919, the Equitable Life Assurance Society of the United States, an old line company, issued a twenty-five year $5,000.00 endowment policy to Walter M. Goodale, then twenty-one years old. The plaintiff, wife of the insured, was named beneficiary but "the right to the insured to change the beneficiary" was reserved. On December 11, 1933, in exercise of this right, in accordance with the rules and regulations of the Society, the insured named the defendant, Viola S. Wilson, as beneficiary in place of his wife. He died November 28, 1934, leaving his widow and their three minor children.

In equity the plaintiff now seeks the annulment and cancellation of the change of beneficiary. Hearing was had before a single Justice, who, finding "that at the time of said alleged change of beneficiary the said Walter M. Goodale was unduly influenced and induced to change the beneficiary in said policy from said Jane T. Goodale to said Viola S. Wilson . . ." by the defendant, Viola S. Wilson, decreed that the change was "null and void and of no effect and no force; and that the proceeds of death benefit or moneys under said policy of insurance be and hereby is decreed to be paid to said plaintiff, Jane T. Goodale, the original beneficiary named in said policy; and that the Equitable Life Assurance Society of the United States is hereby ordered and decreed to pay the amount of said death benefit or moneys under said policy to the plaintiff, Jane T. Goodale, and not to the defendant, Viola S. Wilson."

The case now is before us on appeal from this decree.

The findings of fact by the Justice below must stand unless it is made clearly to appear that it is erroneous. *Young, In Equity* v. *Witham,* 75 Me., 536; *Sposedo, In Equity* v. *Merriman et als.,* 111 Me., 530, 538, 90 A., 387.

Unless in the policy there be reserved the right to change the beneficiary, the beneficiary named in an old line, as distinguished from a fraternal, policy has upon its issue a vested interest therein. Where the right to change is reserved, the named beneficiary has simply a mere expectancy. *Laughlin, Admr.* v. *Norcross, Admx.,*

97 Me., 33, 53 A., 834; *McManus* v. *Peerless Casualty Co.*, 114 Me., 98, 100, 101, 95 A., 510; *Tebbetts* v. *Tebbetts*, 124 Me., 262, 264, 127 A., 720; *Slocum, Admr.* v. *Metropolitan Life Insurance Co.*, 245 Mass., 565, 570, 139 N. E., 816; and the insured during his lifetime "may extinguish the beneficiary's expectancy by substituting another or by assigning the policy, and without the consent of the beneficiary he may deal with the policy as he sees fit, that is to say, he may enjoy every benefit and privilege given him under the policy." Richards on the Law of Insurance, 4th Ed., Sec. 333, page 565.

"A change of beneficiary, to be given effect, must appear to have been made understandingly (*Smith* v. *Harmon*, 59 N. Y. Supp., 1044, 28 Misc. Rep., 681), and if it is shown that there was fraud or undue influence or lack of mental capacity, the attempted change will be regarded as inoperative." Cooley's Briefs on Insurance, Second Edition, Vol. 7, page 6467, and cases therein cited.

It is unquestioned that ". . . it requires no more mental capacity to change beneficiaries in a life insurance policy . . . than it does to make a will. . . ." *McAllister, et al.* v. *Security Benefit Association, et al.*, 261 S. W., 343, 345 (Mo.); *Grand Lodge A. O. U. W.* v. *Brown, et al.*, 125 N. W., 400 (Mich.).

Chief Justice Dunn has recently stated with relation to capacity required in the making of a will:

"The law does not undertake to test the intelligence, and define the exact quality of mind which the testator must possess. Soundness is a matter of degree. That a man may make a valid will, it is not necessary that the greatest mental strength shall prevail. The essential qualification for making a will is a sound mind, which is one in which the testator had a clear consciousness of the business he was engaged in; a knowledge, in a general way, without prompting, of his estate, and a understanding of the disposition he wished to make of it by his will, and of the persons and objects he desired to participate in his bounty. This includes a recollection of those related to him by ties of blood and affection, and of the nature of the claims of

those who are excluded from participating in his estate. A person in such state and condition is capable of willing." *Mitchell, et al., Exceptants In Re Will of Emma J. Loomis,* 133 Me., 81, 85, 86, 174 A., 38, 41.

Acts of undue influence sufficient to invalidate a will will invalidate a change of beneficiary. Whether a will be made or a change of beneficiary be effected, the testator or insured must exercise his own volition. It must be accomplished understandingly by his own act. To destroy his act, the undue influence must be "of such a degree as to take away . . . his free agency—such as he is too weak to resist—such as to render the act no longer that of a capable testator. . . . The influence must amount either to deception or else to force and coercion, in either case destroying free agency." *Barnes, Appellant* v. *Barnes,* 66 Me., 286, 297.

"It follows that the true test is to be found, not so much in the nature and extent of the influence exercised, as in the effect that such influence has upon the person who is making his will. Whatever the nature and extent of the influence exercised, if in fact it is sufficient to overcome the volition and free agency of the testator, so that he does that which is not in accordance with the dictates of his own judgment and wish, and what he would not have done except for the influence exerted, it is undue influence. But the mere fact that arguments and suggestions are adopted by the testator, and his will, on that account, is different from what it otherwise would have been, is not sufficient. It necessarily depends upon the further question as to whether such advice or suggestions are intelligently and freely adopted, because they have appealed to the judgment of the testator, so as to become in accordance with his own desires, or whether, because of the persistency of the importunity, or for any other reason, the testator is unable to resist and finally yields, not because of the voluntary action of his own judgment, but because, on account of the strength of the influence, or the weakness of his own judgment and will, he can not resist longer." *O'Brien, Appellant,* 100 Me., 156, 158, 159, 60 A., 880.

". . . acts of kindness and courteous attention are not undue influence." *Norton, et als., Appellants*, 116 Me., 370, 372, 102 A., 73, 74.

"By undue influence in this class of cases is meant influence, in connection with the execution of the will and operating at the time the will is made, amounting to moral coercion, destroying free agency, or importunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it. . . . Undue and improper influence, . . . presupposes testamentary capacity. . . . Kindness, entreaty, or the offer of inducement to gain the making of a will in one's favor, is legitimate, so long as he who made the will had the free choice to make it or not. . . . Where there is understanding, where there is volition, what motivated the testator's act, even to pique or hostility, is no matter." *Rogers, Appellant*, 123 Me., 459, 461, 123 A., 634, 636.

"Fraud and undue influence in this connection mean whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammelled desire. . . . Mere suspicion, surmise or conjecture are not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence. . . . Three factors are implied: (1) a person who can be influenced, (2) the fact of deception practiced or improper influence exerted, (3) submission to the overmastering effect of such unlawful conduct." *Neill et als.* v. *Brackett et al.*, 234 Mass., 367, 369, 370, 126 N. E., 93, 94.

As briefly as we may, we now tell the story of this regrettable triangle.

Walter was the only child of Charles W. Goodale of York, a man of some affluence, engaged in farming and an ice and milk business. Jane had worked on the father's farm two years before her marriage to his son. The boy was only nineteen when married, his wife twenty-nine. It was a forced marriage, a daughter having been born to them three weeks previously. Charles, the father, testified:

"I made him marry her in this way because I didn't want the disgrace in the family." The son denied paternity of the child but later, after the birth of two other children, did not disown it. For about seven years the couple lived on the father's farm, Walter working and driving trucks in the business. He never worked elsewhere; he received no specified wage or salary. He was paid out of the business, sometimes in currency of no regular amount, and by maintenance of his family. It does not appear that he ever had any settlement with his father.

When this policy was taken out, it was at the suggestion of the father, who paid all of the premiums. Whether these payments constituted gifts or were offset by the labor of the son, the record does not convincingly disclose.

Until Walter met Miss Viola Wilson, some eight years after the marriage, the wife said they got along "as well as the average." The evidence does not disclose any deep-seated affection between them. He first met Viola at a dance. That resulted in his taking her "around." For some time he did not inform her that he was a married man. Finally he volunteered the information to her. She said: "I felt I ought not to go with him any more." He rebelled. He told her the marriage was forced and that there was no affection between him and his wife. A divorce was discussed and on May 1, 1932, Mrs. Goodale started divorce proceedings against him. Before this and ever afterwards, as long as he lived, he was insistent that his wife obtain a divorce. She gave him to understand that she would, although she testified that it never was her intention so to do. The divorce case was continued term after term and the continuances were a source of vehement contention between them.

Jane admitted that Viola stayed at her home many nights after she knew of their affiliation. Walter and his wife had no marital relations for from two to three years before his death, the last year of which for the most of the time he lived in a camp near by the farm buildings. She knew that Viola was many times in the camp with her husband, late nights if not all night, but did nothing about it. He told her of his attachment to Viola and that he wanted his freedom so that he could marry her. He did not practice deception. His father, the wife's witness, testified he acted openly. Ex-

pecting the divorce to be granted and a marriage to Viola to result, he gave her a wedding ring.

The father and son both drank intoxicating liquors. In 1931 Walter had his first alcoholic fit. They were on their way hunting and his father gave him the liquor. Approximately two years later he had another fit in Perkins' Garage, and he died in the third on November 28, 1934. In 1932 he went to a sanatorium in Worcester, Massachusetts, but remained there only a few days. Viola's letters to him while there evince much solicitude for his recovery and welfare. It does not appear that his wife wrote him. Both the father and the wife testified that at mention of Viola's name he often would break down and cry.

There is no evidence to show that Miss Wilson ever knew of the existence of this policy until about six weeks before Walter died. That she knew it then is evidenced only by the plaintiff. Until she had actual knowledge of its existence, she could not have intended any act of hers to result in its change. It was at least six months before she knew there was a policy (if she knew of it as testified by Jane), that Walter had told his wife that he wanted to change it and make Viola its beneficiary.

There was considerable evidence as to the mental capacity of the insured and his susceptibility to influence. The plaintiff produced Dr. Cook, the family doctor, who had known and treated Walter for years when necessary and was his physician at the time of his death. In cross examination, the witness said that he saw much of him during the very important period of about two months preceding the change in the policy. It was changed, as already noted, on December 11, 1933. The doctor was treating Walter's mother from August thirtieth to December second of that year and was at her home, saw Walter and talked with him almost daily. He testified in part:

"Q. And how did you find his mind?

"A. He was very much troubled about his mother. . . .

"Q. And he talked perfectly coherently about his mother, didn't he?

"A. Yes.

"Q. And was there anything during all that time to lead you

to believe that Walter M. Goodale wasn't perfectly compe-
tent to make a will if he saw fit?

"A. I think he could make a will. Yes.

"Q. You think he could make a will all that time?

"A. Yes.

. . .

"Q. And the only thing that you saw about his mental con-
dition was that he became more stubborn and less inclined to
do what somebody else wanted him to do, and became more
centered in his own affairs?

"A. Yes.

"Q. And in that condition would have been difficult to influ-
ence by any one?

"A. It would have been difficult to influence him in any way
that he hadn't any desire to go. Yes. He would do as he had a
mind to.

"Q. He had a mind of his own?

"A. He certainly did."

As to the change Walter consulted an attorney, obtained advice
as to his right to make it and as to the means of its accomplish-
ment. He had had his father's attorney draw up an agreement,
signed by his father, whereby his wife and children, so long as she
should remain unmarried after the divorce, would have the home
in which they had lived, title to which was in the father. He told his
attorney that his father was very fond of his wife and the chil-
dren, that he was the only heir and that upon his father's death his
wife and children would receive all of his property. He said that he
had been going around with Miss Wilson for several years and that
he felt that he ought to protect her to some extent. At none of the
confernces with his counsel did he show any signs of intoxication.
His talk was "absolutely rational."

He had three conferences with the local agent through whom the
change was made, at all of which, it would appear from the agent's
testimony, the insured acted understandingly. When asked whose
name was to be substituted and what the relationship was, he said:
"No relationship now but there is a divorce suit pending and as
soon as that is completed Miss Wilson will be my wife."

The record does not disclose that she knew the change had been made until sometime in the following January, when Walter, telling her that he had some business to transact in Portsmouth (some checks to deposit), asked her if she wanted to ride over. Upon arrival there, he told her that he had something that he wanted her to know about and said: "I have an insurance policy here that is in your name. If anything happens to me, that belongs to you." Miss Wilson then said she started to argue with him but he replied: "It is no use. I knew you would argue anyway; it has been already done and it is mine to do as I please."

That following the cessation of his marital relations with his wife, if not before, he was intimate with Miss Wilson is very probable, although there was no direct evidence to substantiate it; but, says the learned annotator, in 66 A. L. R. on page 243:

"It is generally held that the existence of an illicit or unlawful relation between the testator and the beneficiary is not enough, *per se*, to raise the presumption that the will was procured by undue influence." Citing very many cases from many states.

Pennsylvania had held to the contrary (see *Dean* v. *Negley*, 80 Am. Dec., 620; *Reichenbach* v. *Ruddach*, 127 Pa., 564, 18 A., 432, and *Snyder* v. *Erwin*, 79 Atl., 124); but in a later Pennsylvania case, decided April 12, 1926 (*In Re Wertheimer's Estate*, 133 Atl., 144) the Court doubted if the earlier ruling were still law in that state.

In *Waring* v. *Wilcox, et al.*, 96 Pac. 910 (Cal.), a son, whose policy carried his mother as a beneficiary subject to a reserved right of change, falsely represented to the Company and to his mother that he had married a woman with whom he was living illicitly. It was held that even under those facts the change was legal. The Court said, on page 912:

"It is regrettable that a son should so far forget the duty he owes to the mother who bore him that he should become willing to divert a fund intended for her support to the use of a mistress who could but dishonor him yet the right to manage and control his own confers upon him absolute dominion over

his property, and even confers upon him the right to perform this unfilial act." Also see Cooley's Briefs on Insurance, Vol. 7, pages 6467-6469; *Fulton* v. *Freeland et als.*, 118 S. W., 12 (Mo.).

In *Norton* v. *Clark et al.*, 97 N. E., 1079, it is said on page 1084:

"The existence of an illicit relation does not raise any presumption of undue influence, unless other improper influence is shown to have been exerted to induce the making of the will, such as the supposed threat; but it is a fact to be considered by the jury along with other facts in the case, provided there is proof, in addition to the fact of the unlawful relation, tending to show constraint or interference or undue influence. If there is proof that the beneficiary has exercised influence, the existence of an unlawful relation may be considered for the purpose of determining whether the influence was undue, but not otherwise."

In *New York Life Insurance Company* v. *Andrews*, 167 Ill. App. Ct. Rep., 182, the insured, a woman, possessed of a reserved right to change the beneficiary, exercised it and named as the new beneficiary the daughter of a man with whom the insured had had illicit relations. It was claimed that the paramour exercised undue influence over the insured resulting in the change. The Court said:

"To sustain that contention, the fraud or undue influence must be shown to be such as to practically deprive deceased of her free agency, *and be particularly directed toward securing the desired and accomplished result.*"

Whether the influence, if employed, be brought to bear by a paramour or another having a different relationship, the question is: What effect, if any, does it have? Is free agency destroyed or affected so that the act done is not in accordance with a free will? No doubt it is true the closer the relationship, the more likely it is that the influence attempted to be exerted will be effective. A mistress may at times have unusual influence; a wife, too, where there is no illicit relationship; so also children. Others as well, without any relationship, may possess influence. Sometimes

even strangers, because of reputation and standing in a community, have it. Influences are everywhere prevalent, but, whatever be the relationship, if the person were one who could be influenced and it be proven that an improper influence was exerted upon him, the question is, did he submit to the influence so that that which he did was not an act done in the exercise of his own will? Diverse relationships may afford different possibilities of exerting undue influence, but, nevertheless, there is no dividing line in law on one side of which certain relationships will justify a presumption of undue influence and on the other not. The burden of proof is on the asserter of it.

Application of these principles of law to the facts in this case forces us to conclude that the insured, possessed of sufficient mental capacity, understandingly exercised his own will without undue influence when he made this change in this policy. There is naught in the record to show that Miss Wilson did anything, directly or indirectly, to procure this change. The most that can be said is that if she had knowledge of the fact of the existence of the policy, and she denies it, she, probably having influence, had an opportunity to employ it, did she desire so to do. According to the plaintiff's testimony, she had accidental knowledge of its existence not exceeding six weeks before the change. Long before that, at least six months, the insured had told his wife that he wanted to make the change. Accordingly, she could not have been instrumental in causing him to form an intention to have this change made. It was his own original idea. It was not something done by him impulsively but following many months of reflection. As he saw it, it was a duty he owed Miss Wilson. It was not a secret act, for he disclosed his intention to his wife. He consulted counsel, his father's counsel. He had several interviews with the local agent of the insurer. The use of liquor, if it had had any particular effect on him, according to the doctor's testimony made him more obstinate, more wilful, and more likely to do that which he wanted to do, uninfluenced by anybody. He had always felt, the record indicates, that a grievous wrong had been done him when his father compelled him to marry a woman ten years his senior and for whom he professed no affection. Later, unfortunately for his wife and children, he found this other woman of about his own age with whom, of course wrongly because he

was married, he fell in love. Still, to a certain extent he recognized the rights of his wife and children, for he was solicitous as to their future in providing a home for them. On the death of his father, his considerable property was to go to the wife and the children. But he also wanted to make some provision for Miss Wilson and in her interest he perfected this change in the policy. At the very time that he signed the request for it, he said that upon the granting of the divorce between him and his wife he should marry her. His intention, then, was to make it possible for his future wife to have the proceeds of this policy upon his death. The facts did not justify a finding that in the accomplishment of that purpose he was not acting as a free agent.

But the plaintiff claims that the insured had no right to make the change for another reason. She says that she had an equitable right, based on a contract between the father and son, providing for the issue of this policy with her inclusion as beneficiary and so there could be no change without her consent. It probably is true that Mr. Goodale conceived the idea of the policy and that it was through his suggestion that Walter was insured. No doubt he desired that not only his son, for it was an endowment policy, but his wife and children should be benefited by it. It would have been a very unnatural father and grandfather who would not have had such a desire. Nevertheless, the evidence does not show that any actual contract was made to that end. Mr. Goodale himself explicitly stated on the witness stand: "There was no agreement at all." If the payment of the premiums by the father were a gratuity, it did not evidence a contract. If, on the other hand, the father paid them as he did other bills of Walter's out of the business in which Walter was engaged, no contract was indicated. The significant thing is that the father, having knowledge of the terms of the policy, knew that it stipulated that *the insured* reserved the right to change the beneficiary. This reserved right tends strongly to negative the claim of the plaintiff that it was agreed between the father and son that the plaintiff should have any equitable right in the policy. It is inconsistent with the claim that there was any impressment of a trust.

The cases cited by the plaintiff have been carefully examined by us and we find no one of them enunciating any principle that will

support her contention on the facts as they appear in this case. She also relies upon this quotation from 37 C. J., Sec. 349 on page 583:

"Where the policy reserves to insured the right to change the beneficiary, a change of beneficiary may be made at his instance, without the knowledge or consent of the original beneficiary, or notice to him, unless the insured has divested himself of the right, as by assigning all his rights under the policy, agreeing to keep the policy in force for the beneficiary or making a completed gift of the policy to the beneficiary by delivery to him, or unless a change of beneficiary has been enjoined and the injunction has not been dissolved."

The plaintiff does not bring herself within any of the within stated exceptions.

Particular reliance is placed upon *Travelers' Insurance Company* v. *Gebo, et al.*, 170 Atl., 917 (Vt.), decided February 6, 1934. It was held in that case that the wife had subsequently obtained an equitable interest in the policy so that no change could thereafter be made without her consent. The insured supplanted her by designation of his mother as beneficiary. While her husband was sick, she had worked out and used her earnings and other funds for the general family expenses, it being represented to her that she was to be reimbursed from the proceeds of the policy. She had no knowledge of any intended change. The Court, on page 919, said:

"Where, as here, a contract of insurance so provides, the beneficiary may be changed at the instance of the insured, and no vested right, but only an expectancy, exists in the beneficiary, in the absence of facts or circumstances tending to establish an equitable interest in the proceeds of the policy. . . . Where, however, sound equities exist in favor of the beneficiary, such rights will be protected against the substitution of a second beneficiary who is a volunteer or who has no superior equities in his favor. . . . It is a general rule that such an equitable interest may arise as the result of a contract between the beneficiary and the insured, for while the right of the designated beneficiary is not one of property, being only an

expectancy, 'it is of sufficient potentiality at law or in equity to permit contracts and other obligations in reference thereto which are binding and enforceable in equity after the happening of the event which automatically enlarges the contingent interest to a vested right.' "

We accept the decision in *Travelers' Insurance Company* v. *Gebo*, supra, as sound law; but it is inapplicable to the facts in this case, for herein it has not been made to appear that previously to the issue of the policy either as between the father and the insured or between the insured and the plaintiff as beneficiary there was any contract or that subsequently to its issue there were any acts or conduct which gave to her any equitable interest in the policy. Her interest was a mere expectancy which was extinguished by the insured's exercise of his lawful right to change the beneficiary.

*Appeal sustained.*
*Decree below reversed.*
*Bill dismissed.*