ELLEN FLOOD ET AL., APPELLANTS FROM DECREE OF JUDGE OF PROBATE ALLOWING WILL OF MICHAEL J. MORAN, JAMES A. GARTLAND ET AL. LIKEWISE APPELLANTS, ETHEL WRIGHT ET AL. LIKEWISE APPELLANTS, PETER GARTLAND ET AL. LIKEWISE APPELLANTS.

York.    Opinion, September 8, 1942.

*Titcomb & Siddall,*

*Daniel E. Crowley,* for appellants Ellen Flood, Annie Renick, Peter Gartland and Bernard Flood.

*Willard & Willard,* for appellants Ethel Wright and Marion G. Wright.

*Thomas F. Sullivan,* for appellants James A. Gartland and Peter J. Gartland.

*Louis B. Lausier,*

*William P. Donahue,* for appellee.

SITTING: STURGIS, C.J., THAXTER, HUDSON, MANSER, MURCHIE, JJ.

MANSER, J.   These cases come forward on exceptions to the decree of the Supreme Court of Probate allowing the will of Michael J. Moran, and further exceptions as to restrictions upon admission of two exhibits offered by contestants. The will was contested upon the grounds of lack of testamentary capacity and of undue influence.

Michael J. Moran was a native of Biddeford, Maine, where he lived during his entire life. He died March 14, 1941, at the age of approximately seventy-three years. The will admitted to probate was dated November 14, 1940, and revoked a former one made September 17, 1937, in which two of the contestants, Ethel Wright and Marion G. Wright, second cousins, of a younger generation, were the principal beneficiaries. The other contestants were first cousins and heirs at law.

The case was heard by a jury which returned its advisory verdict that the testator was of sound mind, but that the will

was procured by the undue influence of Thomas Simpson, who was the principal beneficiary. The presiding Justice, however, made a decree affirming the decision of the Probate Court allowing the will.

The record amply supports the decree. It portrays a man who never married, whose parents, brothers and a sister had predeceased him, whose heirs at law were cousins, having no contacts with him, although four of them lived in the same city. So far as disclosed, they paid no attention to him, either in sickness or in health.

His brothers, both older, were physicians. Dr. William Moran lived in Portland. Dr. Thomas Moran and the testator lived together for more than ten years in their own house in Biddeford and until the Doctor's death. All the brothers were bachelors.

The testator is shown to have been a man of good habits, always neat and trim in appearance, a regular church attendant, having no intimate friends but many acquaintances. He was not talkative but not taciturn.

Both brothers died within a few months of each other in 1936. As their heir at law, he received in 1937 and 1938 an aggregate of $43,000. His own estate was appraised at $55,870.

After the death of his brothers, it is shown that he managed his own affairs in prudent fashion. His house consisted of two tenements, in one of which he lived, renting the other. He was on good terms with his tenants, kept the premises in repair, paid taxes and all other bills promptly, procured supplies, kept records for and made income tax returns, kept a checking account upon which, during the last year of his life, he made at least a dozen deposits aggregating over $1000. Four of these, amounting to $296.70, were made in December and January after the execution of his will. On occasion, he sold small amounts of stock. Except for legal advice as to income taxes and as to reorganization proceedings of a concern in which he held stock, he was unassisted, acted of his own volition, without error, and without dispute or disagreement in any of the

transactions. He displayed conservative judgment in his financial affairs as shown by the fact that, when inventoried, his assets consisted of deposits in local banking institutions of over $20,000 and practically the entire balance in good securities. In the winter seasons, following the death of his brothers and until 1940, he went, unaccompanied, to Florida. Although uniformly careful in expenditure of money, he explained to an acquaintance any seeming extravagance by the statement he saved the expense of winter clothing and of fuel. He also said he liked the climate and the people, and it seemed to be good for his health.

He sent from there a basket of fruit to his tenant in recognition of his accommodation in driving him to the railroad station on his departure. He also sent fruit to the Wright sisters, who are contestants and they produced at the hearing as indication of his interest in them, a short note inquiring as to receipt of one package which they had failed to acknowledge. He also made them a present of $50 when, in 1939, he received a letter conveying the information that one had been out of work and the other had been sick for a considerable period.

On the issue of testamentary capacity, the contestants relied, in part, upon alleged eccentricities, as indicative of an unsound mind. The principal witness in this connection was a man who had lived across the street for approximately a dozen years. He testified that he never saw any lights in the house; that the windows were always kept closed; that storm windows remained on all the year around; that tenants would stay one or two months and then move out; that there had been but four or five tenants there in eleven years. He asserted that these conditions also obtained while the brother, Dr. Thomas Moran, was living. He estimated, however, that the tenement was vacant probably four or five weeks in all. He further averred that the testator used to dust the building, lawn and steps with a feather duster; that the door and steps were painted in several noticeable colors different from the house; that at times the testator would come out without a coat, and wearing a

white apron with little strings, such as a waitress would use; that the testator was accustomed to opening the front door slightly, look up and down the street, and then close the door.

Whatever weight this evidence might have had was largely dissipated by the testimony of a tenant of the testator, also called by the contestants. He said the feather duster was used solely to brush off dust from door, windows and sills; that a broom with long handle was used to brush lawn and walks at mowing time; that the steps were painted in two colors, one for the treads and the other for the risers, and that a lighter color than the house was used on window sills. He saw nothing unusual in their appearance. This tenant lived in the house from September 1937 to May 1939. He said the testator used kerosene lamps while he lived there, but he noticed electric lights afterwards. He further testified that he himself put on and took off double windows and saw none remaining on into the summer season except in 1939.

A second claim as to testamentary incapacity was the allegation that the testator suffered a paralytic shock on September 15, 1940, which affected his mental faculties. At the time mentioned, he was found lying on the floor in his home. It was evident that he had been there for at least two days. His left leg was affected. He was taken to a hospital where he remained until November 10th, when he was transferred to a nursing home where he stayed about a month. The nurse at the hospital testified that he remained unconscious for nearly a week.

Dr. O'Sullivan, however, who was called to the testator's home and who attended him for some weeks, testified that he had suffered what is commonly called a heart attack. He was then semi-conscious, but roused up and volunteered the information as to where the house key would be found. He was never unconscious after arrival at the hospital. As to the condition of the left leg, the explanation given by the Doctor was that it was caused by the temporary numbing of the reflexes by pressure from lying so long on the leg, which also produced sores on the hip and knee; that there was no cerebral involve-

ment, and the patient progressed to convalescence satisfactorily. He talked with him daily. He was in a wheel chair in eight days and a little later was able to walk with the assistance of a nurse.

The theory of paralytic shock affecting the brain may well have been negatived in the minds of Court and jury by the medical testimony which was unchallenged by any other expert opinion.

It was further in evidence from another witness who assisted in removing the testator from the house, that he told Mr. Simpson to look after things for him, and told the witness to open a cupboard door and take from money he would find there two dollars for his trouble.

Contestants further sought to introduce certain records upon the ground that they established as a fact that the testator was once committed to the Insane Hospital at Augusta. A paper purporting to be a part of the hospital records was offered through its present Superintendent. The Court admitted a portion reading, "Michael Moran, Biddeford, admitted November 7, 1892. Native of Biddeford, Age 25." and the final portion reading, "January 25. Ad. Thos. Moran Fa. Biddeford. Home." The remainder of the record was excluded. It was shown that the witness had no personal knowledge of the record, nor who made it. The part admitted was upon the ground that it was a public record coming from proper custody, even though not required by statute to be kept, and it would be left to the jury to determine whether it was of and concerning the testator. The excluded portion read as follows:

"Single. Melancholia, hereditary — Had short attack one year ago — Recovered at home; has been depressed — About six weeks and wants to wander about: Has given a great deal of trouble coming here."

Later contestants offered an exhibit of a commitment by the Board of Mayor and Aldermen of Biddeford under date of November 7, 1892, of a Michael Moran, declared to be insane, and

which was directed to the Superintendent of the Insane Hospital. The record was admitted but not as proof of itself that the person committed was the testator.

To these limitations the contestants excepted and the exceptions are presented for consideration by the Court. No other proof was offered as to identity. Not a single witness testified to personal knowledge of the fact as to whether the testator had ever been in the insane asylum. There are rules of law and evidence, unnecessary here to discuss, which would make it doubtful whether the records were admissible at all, but the contestants certainly received all the benefit to which they were entitled. The general rule whether evidence tending to show the insanity of a testator is too remote from the time of the execution of the will is a matter resting very largely in the discretion of the trial court. No general rule can be given on the subject. Each case must depend upon its particular circumstances. *Re Baker*, 176 Cal., 430, 168 P. 881; Annotation 7 A. L. R., 571.

> "The circumstances of each case, in the very nature of things, ought to control, and the discretion of the trial judge, though reviewable for abuse, ought to have weight." *Taylor* v. *Taylor*, 174 Ind., 670; 93 N. E., 9.
>
> "It will be presumed that the ruling of a Judge receiving or rejecting evidence was right unless the exceptions show affirmatively it was wrong." *Hill* v. *Finnemore*, 132 Me., 459, 473; 172 A., 826, 833.

The contestants cannot here complain that there was abuse of discretion. Assuming proof of identity and giving full effect to the observations of the maker of the hospital record, which could not have been within his own knowledge, yet the exhibits might have been excluded in toto. To say that a young man who temporarily suffered from melancholia forty-eight years before, with no evidence of continuation or recurrence of the difficulty, with a history of normal exercise of judgment, not shown to have suffered from any delusions, with no impair-

ment of mental faculties, cannot make a valid will because of a presumption of insanity continuing through nearly five decades is to magnify the probative value of such evidence beyond the limits of credence.

Another claim put forward by the heirs at law is that lack of testamentary capacity is indicated by failure of the testator to take into account the natural objects of his bounty. The mere incidence of collateral kinship is all that is shown to support this claim. There is no evidence of affectionate regard, of services rendered, of concern for his welfare, but instead a complete lack of actual friendly relationship for a long period of time. About two years before the testator made his last will, he told his attorney that there were certain relatives he didn't care for.

"So it is uniformly held that the previous declarations of the testator, offered to prove the mental facts involved are competent." *Jones* v. *McLellan,* 76 Me., 49. See also *Hogan, Appellant,* 135 Me., 249, 194 A., 854; 113 A. L. R., 350.

The testator was under no obligation to these relatives. Their lives were as separate and apart as that of the merest casual acquaintances. The former will, made September 17, 1937, disclosed a definite purpose to dispose of his estate without benefit to them. This was three days after he had received over $16,000 as his distributive share of the estate of his brother, Thomas, and when he knew he was to receive a further sizeable sum from the estate of his deceased brother, William. The record discloses no interest shown by these collateral heirs in the testator during his lifetime, but only the desire to enrich themselves after his death by asserting through the mouths of others that he was of unsound mind.

Undue Influence. The presiding Justice, notwithstanding the finding of the jury to the contrary, decided that the contention of undue influence was not sustained. This question is not before this Court for original determination. Findings of fact by the trial court are conclusive and not to be reviewed by the

Law Court if the record shows any reasonable and substantial evidence to support them. *Trust Co.* v. *Baker,* 134 Me., 231, 184 A., 767; *Goodale* v. *Wilson et al.,* 134 Me., 358, 186 A., 876; *Mitchell et al, Exceptants,* 133 Me., 81, 174 A., 38; *Chaplin, Appellant,* 133 Me., 287, 177 A., 191.

> "This Court sits to determine whether or not there was sufficient evidence (any evidence is the common expression) to justify the findings and decree of the appellate Probate Court." *Eastman et al. Appellants,* 135 Me., 236, 194 A., 586, 588.

That the presiding Justice acted with careful deliberation is evidenced by the fact that, faced with the acceptance or rejection of the jury finding, he came to the conclusion that he must take the responsibility of regarding it as unwarranted. This was his duty. *Eastman et al. Appellants,* 135 Me., 233, 194 A., 586.

Thomas Simpson, a relative and neighbor, and principal beneficiary under the will, is charged with undue influence. The basis of the claim as culled from the evidence by counsel for contestants is that he had been interested in the testator for some time, and during the last few months had practically sole access to him. He found the testator lying on the floor of his home in the fall of 1939. He arranged for his hospitalization, and later his removal to a nursing home. He took him to the office of the attorney when the will was made. He secured a reduction of five dollars in his taxes. He visited him in the hospital and talked with him in a low tone of voice. He took him for automobile rides during convalescence and afterward. He collected rent from a tenant one winter when the testator was in Florida. By direction of the testator, he paid two or three bills with the testator's money. He did not notify the Wright sisters of the illness of the testator. Simpson did not testify. Thus is summed up the basis of the charge of undue influence.

On the other hand, the record is devoid of any evidence of fraud or coercion, of any solicitations or importunities, of any

attempt to control the conduct of the testator, of any domination, of any assiduous attention, of any fiduciary or confidential relationship, of any attempt to alienate the testator from the beneficiaries under the former will.

Whatever hope Mr. Simpson may have had of benefit to be gained, his conduct was consistent with that of a kindly friend and neighbor toward a lonely, elderly man, who had lost a brother with whom he had lived for a generation; who was growing physically infirm, and who needed some care and attention. The testator appreciated it. He told others so.

"The influence of kindness is not undue influence."
*Eastman et al. Appellants, 135 Me., 233, 194 A., 586, 589.*

But he continued to control his own affairs. He discharged his physician when he felt himself to be convalescent, and the Doctor agreed that there was no further actual need for his services. He still made his own bank deposits, and the slips were written with his own hand. Nowhere does it appear that he surrendered his own judgment to that of Simpson.

As to the substantial change he made in his last will, it is needless to hunt for a reason, so long as there is nothing to show he was deprived of the power to act as a free agent, was morally coerced, or subjected to importunities which he was too weak to resist.

There is naught to show that the testator desired to see the Wright sisters, who had not seen him but once in ten or twelve years, and then only at the funeral of his brother. Nor to show that Simpson intrigued to prevent them from knowing of his illness. There were five other relatives in Biddeford and they sent them no word. It does appear of record that on January 6, 1939, he wrote Ethel Wright of his intention to call on them on his way home from Florida. A little later he received from her a letter setting forth, at least impliedly, their need of financial aid. He replied on March 23, 1939, as follows:

"I am not going to stop at Salem. I am sending a Check to you and you can give Marion some."

The fact finding tribunal might draw reasonable inferences from this change of mind, although it was not necessary to ascribe a reason for his acts.

The statement of legal principles, both as to the issue of undue influence and testamentary capacity, as laid down by our own Court, together with factual situations therein considered, in our opinion not only warranted the conclusion reached by the presiding Justice but compelled it. Reference may be had to the following: *Rich* v. *Gilkey*, 73 Me., 595; *O'Brien, Appellant*, 100 Me., 156, 60 A., 880; *Rogers, Appellant*, 123 Me., 459, 123 A., 634; *Chandler Will case*, 102 Me., 72, 66 A., 215; *Randall et al., Appellants*, 99 Me., 396, 59 A., 552; *Hall* v. *Perry*, 87 Me., 569, 33 A., 160, 47 Am. St. Rep., 352; *Martin, Appellant*, 133 Me., 422, 179 A., 655.

The mandate will be

> *Exceptions overruled.*
>
> *Decree of Supreme Court of Probate affirmed.*
>
> *Case remanded to Probate Court.*
>
> *No counsel fees or disbursements allowed to Contestants accruing subsequent to decree below.*

WORSTER, J., sat, but having retired, did not participate.