2003 ME 35

**ESTATE OF James Leo DESCHENES.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Dec. 13, 2002.
Decided: March 18, 2003.

James J. Shirley, Roberts & Shirley, Springvale, for appellant.

Gregory O. McCullough, Sanford, for appellee.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

DANA, J.

[¶ 1] Maureen Deschenes, Personal Representative of the Estate of James Leo Deschenes ("Leo"), appeals from the judgment of the Oxford County Probate Court (*Hanley, J.*) holding that prior to his death Leo Deschenes legally transferred to Paul and Charles Deschenes by deeds the right, title, and interest to his Shapleigh, Maine, property. Maureen contends that the court erred in finding delivery of the deeds. Paul cross appeals from the court's denial of his motion, pursuant to 18–A M.R.S.A. § 1–601(1998),[1] to allow Leo's es-

---

1. Section 1–601 (1998) provides in pertinent part: "In contested cases in the original or appellate court of probate, costs may be allowed to either party, including reasonable lowed to either party, including reasonable ... attorney's fees, to be paid to either or both parties, out of the estate in controversy, as justice requires." 18–A M.R.S.A. § 1–601 (1998).

tate to pay his costs, including attorney fees. We affirm both decisions.

## I. BACKGROUND

[¶ 2] Leo, who died in August 1998, owned two contiguous parcels of land in Shapleigh that he called "Camp Iwo Jima" to memorialize his World War II military service in which he suffered wounds. From April 1985 through June 1985, while a patient at the Veterans' Administration Hospital in Togus, Maine, Leo consulted a VA lawyer about his options regarding his Shapleigh property. Concerned that the Veterans' Administration would attach his camp or it would pass out of the family, Leo had a lawyer prepare, and he signed, two deeds naming his brothers Paul and Charles as grantees in joint tenancy with rights of survivorship. Leo and Charles signed the corresponding transfer tax forms. Paul was unaware of the deeds.

[¶ 3] Theresa, Paul's wife, testified that at a family gathering some time between 1985 and 1987, Charles waved the transfer tax forms in front of her face and asked, "[W]hy would Paul have everything and us have nothing[?] My sisters and brothers have nothing." [2] Charles, his wife Maureen, and Theresa discussed having a new will made, presumably to allow all the siblings to share in the property. To that end, Charles gave the forms to his sister Christine and told her to hide them "so nobody can ever find them." Although Leo was present, he said nothing during the talk about whether the deeds should be changed. Paul had left the gathering before the form-waving incident and subsequent discussion of the deeds.

[¶ 4] Leo devised his estate in equal shares to his siblings. Charles died ten days after Leo. The day after Leo's death, Paul's daughter, Anne Wintermute, who

had purchased her uncle Leo's Sanford house four years earlier, found hidden, in an upstairs closet, a series of five deeds and five State of Maine Real Estate Transfer Tax Declaration forms bearing Leo's name. Because Leo had been either in a hospital or a nursing home, or had been infirm and unable to climb stairs, someone other than he had hidden the deeds. Anne brought the documents next door to her parents' home. Among them were the two deeds, dated May 1985, and two undated transfer forms conveying Camp Iwo Jima to Paul and Charles. The deeds did not recite a date of execution, were not witnessed or acknowledged, and had not been recorded.

[¶ 5] In April 1999, Maureen, the Personal Representative of Leo's Estate, sought a determination of the title to the Shapleigh property and asked for costs. Paul counterclaimed, asking the court to name him the sole owner of Camp Iwo Jima and to order Maureen on behalf of Leo's estate to pay his costs.

[¶ 6] The court determined that the deeds had been legally delivered, finding for Paul and against Maureen as Personal Representative of Leo's Estate. The court based its determination on (1) Leo's inquiry of an attorney while a Veterans' Administration Hospital patient concerning his "options" to memorialize within his family his sacrifice at Iwo Jima; (2) the fact that Leo did not "retain the deed or secret the deed away so as not to comply with the 'manual transfer' requirement"; and (3) Leo's failure to subsequently declare an intent to retract or disavow his conveyance to either Paul or Charles, even when he had an opportunity to do so at the family gathering when Charles raised the issue. The court also found that Paul's accep-

---

2. Leo Deschenes had six siblings: Edward, Christine, Caroline, Marcelline, Charles, and Paul.

tance of the deeds after Leo's death constituted a completed delivery, vesting Paul, rather than the estate, with title to the property.

[¶ 7] Maureen moved to alter or amend the court's judgment and have the court find for the estate. Paul moved for allowance of costs, including attorney fees. After a hearing, the court reaffirmed its holding and denied both Maureen's and Paul's motions. This appeal and cross-appeal followed.

## II. DISCUSSION

### A. Delivery of Deeds

[¶ 8] First, we consider whether the court erred in finding that the deeds were legally delivered. Maureen contends that because there is no credible evidence that Leo had manually transferred the deeds to Paul or anyone else, the court's finding of delivery was clearly erroneous. Specifically, she contends that when Leo signed the deeds, he had no present intention to transfer his property; Paul's assent to the delivery of Leo's deeds could not constitute a completed delivery because there is no evidence that if Leo transferred the deeds to Charles, he did so without reservation; and the court erred in finding that the delivery to Charles as a third party was sufficient to vest title in Paul when, after Leo's death, Paul accepted delivery of the deeds. She concludes that absent proof that the deeds were delivered to Charles or were given to him without reservation for delivery to Paul, and absent any indication that Charles accepted them, there was no delivery to either brother.

[¶ 9] Conversely, Paul contends that the court's finding that the two deeds were delivered is not clearly erroneous because (1) Maureen failed to carry her burden of proof; (2) there is ample evidence of manual delivery; (3) there is "compelling evidence" of Leo's intent; and (4) there is "no want of acceptance affecting delivery."

Specifically, he contends that multiple acts evince Leo's intent: his discussing with the lawyer at the VA hospital his plans to convey the property to Paul and Charles; his making a new will without a special bequest of $10,000 to Paul to thank him for having cared for Leo for many years, a bequest no longer necessary once the camp conveyance replaced it; and Leo's silence at the family gathering despite "a clear opportunity to qualify or disclaim his intent as expressed in the deeds." Paul asserts that Leo signed the deeds intending to effect a present transfer, but did not date or notarize them because no lawyer or notary was available in his hospital room. The signed transfer tax forms, Paul argues, prove Leo's intent to make the deeds presently effective; they also prove delivery of the deeds to Charles, a grantee. Paul also contends that the evidence indicates that Charles had accepted the deeds when he signed the transfer tax forms in May 1985, and that he had retained possession of both after Leo gave them to him to sign. Because delivery already had occurred, it did not matter that Charles might have changed his mind several months later at the family gathering. Therefore, both Charles (for the reasons enumerated above) and Paul (because he accepted the deeds when he learned of them after Leo's death) accepted the deeds.

[¶ 10] The key to determining whether the deeds were delivered is whether Leo intended to relinquish control of the property. "The conveyance of title to property requires a manual transfer of the deed and an intent to pass title between a grantor and grantee." *Poling v. Northup*, 652 A.2d 1114, 1115 (Me.1995) (citations omitted). "When the physical possession of a deed is transferred from one party to another, there is a presumption that 'both parties intended to effect an

immediate transfer of the title, in accordance with the terms of the deed.' " *Waxler v. Waxler,* 1997 ME 190, ¶ 8, 699 A.2d 1161, 1163 (citation omitted). A grantee's failure to record a deed does not rebut the presumption of delivery. *Id.* ¶ 10, 699 A.2d at 1164.

 [¶ 11] We review the record for clear error to determine whether competent evidence exists to support the trial court's factual conclusions. *Stickney v. City of Saco,* 2001 ME 69, ¶ 13, 770 A.2d 592, 600.

> Findings are clearly erroneous when *no competent evidence* supporting the finding exists in the record; the factfinder clearly misapprehended the meaning of the evidence; or the force and effect of the evidence taken as a whole, rationally persuades us *to a certainty* that the finding is so against the great preponderance of the believable evidence that it does not represent the truth and right of the case.

*Morin v. Dubois,* 1998 ME 160, ¶ 3, 713 A.2d 956, 958 (emphasis added).

 "Maine has traditionally followed . . . the . . . rule that delivery of a deed is a consensual act. Thus, effective delivery of a deed requires the correlative act of acceptance by the grantee." *Hood v. Hood,* 384 A.2d 706, 708 (Me.1978) (citations omitted). We have held that "subsequent assent by a grantee to a conveyance made without such grantee's knowledge is sufficient to constitute an acceptance, at least where there has been a physical delivery of the deed, without reservation, by

the grantor to a third party." [3] *Id.* "The question of acceptance [is] one of fact." *Id.* The Probate Court found that "[b]ased on the evidence presented at trial, . . . Paul accepted the deed from Leo as soon as it was discovered by his daughter at [her home], and subsequently delivered to his home next door."

[¶ 12] Further, the court saw no evidence that Leo ever tried to revoke his conveyance to either Paul or Charles, though he had a perfect opportunity to do so at the family gathering.

 [¶ 13] Moreover, the fact that the deed was unrecorded is irrelevant. *See Waxler,* 699 A.2d at 1164. "The want of record of a deed does not render the instrument void. Want of record does not reinvest seizin in him who gave the deed. . . . The delivery of the deed, although unrecorded, [is] sufficient to transfer seizin. . . ." *Gatchell v. Gatchell,* 127 Me. 328, 331–32, 143 A. 169, 170 (1928).

[¶ 14] We affirm the finding that the deeds were legally delivered and that Paul holds title to the property.

## B. Attorney Fees

[¶ 15] We consider next whether the court erred in denying Paul attorney fees. On cross-appeal, he contends that the court applied an incorrect legal standard pursuant to section 1–601 when it denied his request for costs including attorney fees. Citing *Estate of Wright,* 637 A.2d 106, 110 (Me.1994), he asserts that the

---

**3.** The Probate Court focused on Paul's direct acceptance. The court did not address an alternative theory of effective transfer: that Charles had accepted the deeds—as evidenced by his signature on the transfer tax forms, his physical possession of the forms and deeds at the family gathering, and his giving them to Christine to hide—and that, acceptance by that third party/joint tenant with Paul also constituted an acceptance on

Paul's behalf. *See Tripp v. McCurdy,* 121 Me. 194, 196, 116 A. 217, 218 (1922) ("[T]he delivery of a deed to a third person may be sufficient although no prior authority had been given by the grantee to receive the deed, where the grantee subsequently assents, and as the deed is for the benefit of the grantee 'such assent will be prima facie presumed' ") (citations omitted).

deciding factor in whether "justice requires" reimbursement is whether the litigation was "beneficial to the estate," a standard met when the litigant proceeds in "good faith" and the question raised is a "close call." Because he prevailed against Maureen, advancing Leo's intent, he believes his suit was beneficial and, therefore, he is entitled to attorney fees.

[¶ 16] We review a trial court's decision concerning to award attorney fees solely for an abuse of discretion. *Largay v. Largay,* 2000 ME 108, ¶ 16, 752 A.2d 194, 198. Pursuant to 18–A M.R.S.A. § 1–601, "costs may be allowed to either party ... as justice requires." "The decision to award costs, including attorney fees, to a party is left to the sound discretion of the probate judge." *In re Estate of Stowell, II,* 636 A.2d 440, 442 (Me.1994). Because the court acted within its sound discretion, we affirm its decision to deny attorney fees to Paul.

The entry is:

Judgment affirmed.