2003 ME 71

**ESTATE OF Agnes MARQUIS**

Supreme Judicial Court of Maine.

Submitted On Briefs: April 9, 2003.
Decided: May 12, 2003.

Thomas M. Brown, Esq., Peter D. Klein, Esq., Eaton Peabody, Bangor, for appellant.

Barry K. Mills, Esq., Hale & Hamlin, LLC, Ellsworth, for appellees.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and LEVY, JJ.

RUDMAN, J.

[¶ 1] Daniel Pelletier appeals from the judgment entered in the Hancock County Probate Court (*Patterson, J.*) in favor of Robert Marquis (Marquis), the Personal Representative of the Estate of Agnes Marquis (decedent). Pelletier asserts the court erred in determining the decedent lacked the mental capacity to change beneficiary designations on her two annuity policies. Marquis cross-appeals from the court's decision ordering the decedent's estate to pay Pelletier's attorney fees in accordance with 18–A M.R.S.A. § 1–601 (1998). We are not persuaded by Pelletier's arguments, find no error in the Pro-bate Court's award of attorney fees, and, therefore, affirm the judgment.

## I. BACKGROUND

[¶ 2] The decedent died on July 31, 2001, at the age of eighty-one. She never married or had children, but was survived by several nieces and nephews who live in the greater Bangor area.

[¶ 3] At the time of her death, the decedent owned two annuities issued by Metropolitan Life Insurance Company (MetLife), which lie at the heart of this dispute. The decedent purchased the first annuity in 1985 and the second annuity in 1996. She initially designated her estate as the beneficiary on both policies.[1]

[¶ 4] The decedent executed a will on February 19, 1997. The will left $4,000 bequests to twelve family members and one friend. The will also provided that the remainder of the decedent's estate was to pass in equal shares to two charities: the Greater Bangor Area Shelter, and the Sisters of Mercy in Name of St. Joseph's Convent and Hospital.

[¶ 5] The transaction giving rise to the present appeal transpired on November 10, 2000, when the decedent changed the beneficiaries of her annuities from her estate to Daniel Pelletier, her grandnephew. The decedent met with Anthony Sivik, the MetLife office manager in Bangor, for approximately seventy-five minutes. Sivik testified that the decedent appeared well spoken and that she decided to make Pelletier the beneficiary on her policies because he was the only relative who visited her on holidays and regularly helped her run errands. Sivik, however, could not express an opinion concerning the nature

---

1. The decedent acquired "lump-sum" annuities. As the policy owner, she had the option of drawing periodic cash payments from the fund or cashing the policy at any time. The decedent did not draw any cash payments, and the annuities had accumulated a combined value of approximately $84,000 at the time of her death.

and extent of the decedent's understanding of the annuity policies because the parties did not discuss the policies' exact terms during the meeting.

[¶ 6] In early February 2001, approximately three months after the decedent named Pelletier as beneficiary, three of the decedent's relatives petitioned the Probate Court for temporary guardianship and conservatorship of the decedent after witnessing her behavior, mental capabilities, and physical condition deteriorate. The Penobscot County Probate Court (*Woodcock, J.*) granted the petition on February 5, 2001. Pelletier thereafter filed a competing guardianship petition because he believed that the temporary guardians were not serving in the decedent's best interests. Ultimately, the three temporary guardians became permanent guardians, and the parties agreed to name Nathan Dane, Esq. to serve as the conservator.

[¶ 7] After some investigation, Dane concluded that the decedent's November 10, 2000 change of beneficiary designation was invalid on grounds of lack of capacity. Dane requested that MetLife void the transaction and reinstate the estate as the proper beneficiary. MetLife declined on the grounds that a court order was required. The decedent passed away, however, before Dane could make the requisite filing with the court.

[¶ 8] In September 2001, Marquis, as the Personal Representative of the decedent's estate, filed a petition for declaratory relief and change of annuity beneficiary in the Penobscot County Probate Court.[2] Marquis asked the court to void the change in beneficiaries. He asserted the decedent did not have the requisite mental capacity

to contract on November 10, 2000 and, thus, the annuities should be paid to her estate.

[¶ 9] At the hearing before the Probate Court, the parties introduced testimonial and other evidence concerning the decedent's conduct and mental abilities between 1999 and her death in 2001 in an attempt to discern the decedent's mental capacity when she changed the beneficiary designation.[3] The court found the decedent lacked the capacity to change the annuity beneficiary, and it ordered MetLife to deliver the annuity proceeds to the estate. The court also ordered the estate to pay Pelletier's reasonable attorney fees, pursuant to 18–A M.R.S.A § 1–601.

[¶ 10] Both parties filed notices of appeal.

## II. DISCUSSION

### A. The decedent's mental capacity

■ [¶ 11] Pelletier first asserts the Probate Court failed to delineate and apply the appropriate legal standard for determining whether the decedent possessed sufficient mental capacity to change the beneficiary designation on her annuity policies. He specifically contends that the testamentary capacity standard should apply. We disagree.

[¶ 12] In its articulate and well-reasoned decision, the Probate Court accurately stated that "[c]hanging the annuity beneficiary requires the same mental capacity as does the execution of the underlying contract." This proposition is a correct statement of the law because an annuity is a contract, *Lander v. Hartford Life & Annuity Insurance Co.*, 251 F.3d 101, 104 (2d Cir.2001), and, therefore, the rules govern-

---

**2.** The case was transferred from Penobscot County to Hancock County before trial.

**3.** The Greater Bangor Homeless Shelter and the St. Joseph's Convent and Hospital declined to participate in the hearing.

ing the validity and legality of contracts apply to the validity of an annuity policy, *see Rishel v. Pacific Mutual Life Insurance Co. of California,* 78 F.2d 881, 884 (10th Cir.1935).

[¶ 13] Hence, a party to an annuity contract must possess the mental capacity necessary for executing a valid contract—and not that required to execute or amend a will—when changing the beneficiary designation on an annuity policy.[4] *See Stockett v. Penn Mut. Life Ins. Co.,* 82 R.I. 172, 106 A.2d 741, 742–43 (1954) (holding the decedent possessed sufficient capacity to execute an annuity policy even though advanced in age, infirm, illiterate, and generally inexperienced in business matters).

[¶ 14] In Maine, section 15 of the RESTATEMENT (SECOND) OF CONTRACTS (1981) provides the standard for evaluating whether a party possesses the requisite mental capacity to contract. *Bragdon v. Drew,* 658 A.2d 666, 668 (Me. 1995) (holding a grantor's mental incapacity alone is sufficient to rescind a deed).[5] Section 15 specifically provides, in relevant part:

(1) A person incurs only voidable contractual duties by entering into a trans-action if by reason of mental illness or defect

(a) he is unable to understand in a reasonable manner the nature and consequences of the transaction, or

(b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.

[¶ 15] To give context to the foregoing standard, comment b states that mental incompetency may include mental deterioration resulting from old age, or "mental illnesses evidenced by such symptoms as delusions, hallucinations, delirium, confusion and depression." RESTATEMENT (SECOND) CONTRACTS § 15 cmt. b. The party asserting incompetency has the burden of proving irrational or unintelligent behavior, and the court may consider "almost any conduct," including lay and expert opinions, and evidence of age, bodily infirmity, or disease. *Id.* at cmt. c.

[¶ 16] Having determined that contractual capacity governs the present analysis, we must next address Pelletier's contention that the court improperly found the decedent lacked the mental capacity to amend her annuities. We review a trial court's capacity determination, a question

4. In *Goodale v. Wilson,* 134 Me. 358, 360, 186 A. 876, 877 (1936), we considered whether a decedent's change of beneficiary on an insurance policy was void on grounds of undue influence. In making this determination, we considered evidence of the decedent's mental capacity in order to discern his susceptibility to influence and observed that "it requires no more mental capacity to change beneficiaries in a life insurance policy ... than it does to make a will." *Id.* at 361, 186 A. at 877 (internal quotations omitted). Like an annuity, however, an insurance policy is a contract. 24–A M.R.S.A. § 3 (2000) (defining "insurance" within the Maine Insurance Code); *see Pelkey v. Gen. Elec. Capital Assurance Co.,* 2002 ME 142, ¶ 10, 804 A.2d 385, 388 (noting "[t]he interpretation of an insurance contract is a matter of law that we review de novo").

We, therefore, now clarify our language in *Goodale,* noting that changing the beneficiary on a life insurance policy requires the same mental capacity as executing a valid contract. *E.g., Rawlings v. John Hancock Mut. Life Ins. Co.,* 78 S.W.3d 291, 297 n. 1 (Tenn.Ct.App. 2001).

5. Although our case law discussing and applying this section of the Restatement generally focuses on the exchange of real property, *e.g., Bowden v. Grindle,* 675 A.2d 968, 970 (Me. 1996), land transactions are contractual and, therefore, provide the applicable standard governing the decedent's mental capacity to amend the beneficiary designation on her annuities.

of fact, for clear error. *Estate of Siebert,* 1999 ME 156, ¶ 6, 739 A.2d 365, 366–67. We will uphold the trial court's finding "[i]f there is any competent evidence in the record" that supports the decision. *Estate of Turf,* 435 A.2d 1087, 1089 (Me.1981).

■ [¶ 17] Sufficient evidence exists in the record to support the court's determination that the decedent lacked capacity to contract when she changed the beneficiary designation on her annuities. First, the decedent's former housekeeper, Onida Dubois, testified that the decedent's condition was deteriorating rapidly by May 2000. Dubois recalled incidents when the decedent thought someone was talking to her through the television and when the decedent stated that her dog nursed her to health when she fell ill. Dubois also testified that she often found uncashed checks and unpaid bills in the decedent's house when Dubois returned from extended absences. Second, various relatives testified that the decedent indicated having visions of her dead brother, fearing non-existent Quakers would enter her house in the middle of the night, and believing she was going to marry Jesus.

■ [¶ 18] Finally, Karen Hover, M.D., stated in her deposition testimony that, in her opinion, the decedent suffered from dementia approximately one week before and three weeks after the decedent amended the annuity policies.[6] Doctor Hover's opinion concerning her patient's condition prior to and after amending the policy is competent evidence to show the decedent's mental competency at the time of execution. *See Appeal of Martin,* 133 Me. 422, 433, 179 A. 655, 661 (1935) (holding a "patient's condition some time before, and some time after, making the will is relevant, as tending to show the condition of mind when it was executed").

[¶ 19] Pelletier specifically contends that, notwithstanding this testimonial evidence, the court erred because it did not rely on Sivik's testimony, the only witness presenting evidence of the decedent's conduct and capacity on the day she amended the annuity. He also argues the court improperly relied on the testimony of the decedent's former attorney, Michael Griffin, because Griffin's observations were too remote in time from the day that the decedent amended her annuities.

■ [¶ 20] Pelletier's arguments are misguided, however, because evidence of the decedent's behavior for a reasonable period before and after she amended the annuities is admissible to show her capacity on the day in question. *See Estate of Record,* 534 A.2d 1319, 1321 (Me.1987) (stating that evidence of a testator's behavior before and after the execution of a will is admissible to show his testamentary capacity). Accordingly, the court did not commit clear error in finding the decedent lacked the capacity to change the beneficiary designation on her annuity policies.

---

6. Doctor Hover is a family practitioner who dedicates between ten and fifteen percent of her practice to elderly patients suffering from mental infirmities, including dementia. Although Hover did not testify at trial, the court admitted her deposition in evidence over Pelletier's objection that her opinion was unreliable because she did not base her opinion on sufficiently objective scientific criteria. Pelletier reasserts, on appeal, that the court erred by admitting and relying on Hover's deposition when making its determination concern-ing the decedent's mental capacity. We, however, review the court's decision to admit expert testimony for clear error and an abuse of discretion. *State v. Fleming,* 1997 ME 158, ¶ 14, 698 A.2d 503, 507. In this case, the Probate Court acted within the bounds of its discretion because Hover's testimony was relevant, conformed to generally accepted scientific practices, and assisted the court in determining the decedent's mental capacity. *See State v. Williams,* 388 A.2d 500, 504 (Me. 1978).

### B. Attorney Fees

[¶ 21] We next consider whether the court erred in ordering the decedent's estate to pay Pelletier's attorney fees. On cross-appeal, Marquis contends that the court misapplied the "as justice requires" standard set forth in 18–A M.R.S.A. § 1–601. He asserts Pelletier is not entitled to the attorney fees because the estate was entitled to the annuity proceeds, and the present lawsuit became necessary only after Pelletier refused to surrender them.

[¶ 22] We review a trial court's decision concerning the award of attorney fees for an abuse of discretion. *Estate of Deschenes,* 2003 ME 35, ¶ 16, 818 A.2d 1026, 1031. Section 1–601 provides, in relevant part, that the Probate Court may allow costs to either party, "including reasonable ... attorney's fees, to be paid to either or both parties, out of the estate in controversy, *as justice requires.*" 18–A M.R.S.A. § 1–601 (emphasis added). When evaluating the "as justice requires standard," the Probate Court's "primary concern ... should be whether the litigation has been beneficial to the estate ...." *Estate of Voignier,* 609 A.2d 704, 708 (Me. 1992). Actions brought or litigated in good faith are beneficial to the estate because they comport with section 1–601's rationale and objective of discouraging "speculative claims and nuisance actions." *Estate of Wright,* 637 A.2d 106, 110 (Me. 1994) (upholding court's award of fees to testator's children because the children initiated their suit challenging a choice of law provision in the testator's will in good faith).

[¶ 23] In this case, the court did not exceed the bounds of its discretion in ordering the estate to pay Pelletier's attorney fees. Pelletier did not initiate the present lawsuit; rather, he sought merely to defend his contractual right to the annuity proceeds after Marquis challenged the validity of the decedent's change of beneficiary designation. Pelletier, therefore, did not act in bad faith or pursue a "speculative claim" or "nuisance action" of the type the legislature designed section 1–601 to discourage. *See Wright,* 637 A.2d at 110.

[¶ 24] Moreover, as the Probate Court found, Pelletier's defense of the present litigation benefited the estate because it assisted the court in determining whether the decedent's change of beneficiary was the product of undue influence or insufficient capacity. *See Wright,* 637 A.2d at 110 n. 5; *Estate of Brideau,* 458 A.2d 745, 748 (Me.1983) (adopting the rationale of a Florida court holding that an estate benefits when parties litigate a will's validity, in good faith, because the proceedings enable the court to resolve the controversy). Accordingly, the court acted within the bounds of its discretion and, therefore, we affirm its decision to award attorney fees to Pelletier.

The entry is:

Judgment affirmed. Remanded to the Probate Court to calculate the amount of Pelletier's reasonable attorney fees.